Argued January 16; affirmed February 5, 1935

# KELLER *v.* COMMERCIAL CREDIT CO. ET AL.

(40 P. (2d) 1018)

*Marvin K. Holland,* of Portland, for appellant.

*E. M. Morton,* of Portland, for respondent Commercial Credit Co., *C. C. Hall,* of Portland, for respondent Oregon State Bank.

BELT, J.  This is an action on the case. It is alleged that the defendants, pursuant to a conspiracy, committed a series of wrongful acts resulting in injury to plaintiff's automobile business and to his credit. General damages were demanded in the sum of $60,000. From a judgment of involuntary nonsuit, the plaintiff appeals.

Plaintiff began in the automobile business in the city of Portland in October, 1930. He was an associate dealer for De Soto and Plymouth automobiles and had a well-established business. It had been his custom for several years to deal with the defendants in financing the various transactions which arose in the course of buying and selling automobiles. Most of the plaintiff's automobile paper, however, was handled by the defendant, Commercial Credit Company.

Before stating the issues, it may be well to review briefly the methods followed by plaintiff in financing his business. When a car was sold by the factory to the plaintiff as dealer, 90 per cent of the cost price plus freight was advanced by the finance company. Plaintiff, to secure such advance, executed his note and a trust receipt for the car purchased. Under this plan the dealer held the car in trust for the finance company. The latter had the unqualified right to take pos-

session of the automobile without notice or demand. In the event of a sale by the dealer for cash, he was required to immediately remit the proceeds to the finance company. To cover the purchase of a demonstrator, a conditional sales contract was executed by some member of plaintiff's family and assigned by the dealer to the finance company with guarantee of payment. In the event a car was sold by the dealer, the conditional sales contract was assigned and sold to the finance company at a discount—a certain amount of the discount price being deducted by the credit company and held as a part of a "loss reserves" account.

In the amended complaint it is charged that defendants, in October, 1931, acting pursuant to a conspiracy, falsely and maliciously committed the following wrongful acts:

(1) Publicly charged that plaintiff had issued duplicate securities and contracts on the same automobile; had obtained loans from defendants under false representations as to the securities for such loans; and had committed crimes in getting such loans from defendants.

(2) Threatened plaintiff publicly with criminal prosecution and arrest.

(3) By duress and force took over plaintiff's automobile business and put incompetent persons in charge thereof.

(4) Applied plaintiff's general deposit in the defendant bank to payment of notes owned by the bank contrary to an alleged agreement for extension of time of payment.

(5) Refused to cash checks issued by plaintiff and returned same marked "Insufficient Funds", notwithstanding plaintiff had money on deposit sufficient to pay such checks.

The plaintiff avers that, as a result of these alleged wrongful acts, he was "caused to lose his contract

with Roy Burnett Motors and his contract with the De Soto factory for handling De Soto automobiles in the territory of Portland, Oregon, as associate dealer, and plaintiff's business as an automobile dealer was taken over by defendants and destroyed and rendered of no value, and plaintiff's credit and good name injured and damaged, and plaintiff was prevented from carrying on his business, all to plaintiff's damages in the amount of sixty thousand and no/100 ($60,000.00) Dollars''.

■ The allowances of the motion for a judgment of involuntary nonsuit presents the question: Is there any evidence tending to show that the defendants, or either of them, committed one or more of the wrongful acts of which the alleged injury to plaintiff's automobile business and to his credit was the natural and proximate result? It was not essential to recovery that there be proof of conspiracy. Conspiracy is not the gravamen of the complaint. The injury of which plaintiff complains was possible of accomplishment by the act of either defendant. Of course, if judgment were to be obtained against both defendants, proof of conspiracy or joint action would be essential. In an action of this nature where two or more defendants are proceeded against as conspirators in the commission of a tort which would be actionable if committed by one alone, a judgment against one or more of such defendants may be sustained without proof of a conspiracy. As stated in *Doremus v. Hennessy*, 62 Ill. App. 391:

"It is now well established that, in civil actions, the conspiracy is not the gravamen of the charge, but may be pleaded and proved in aggravation of the wrong of which the plaintiff complains, and as enabling him to recover against all the conspirators, as joint tort feasors. If a plaintiff fail in the proof of a conspiracy, or concerted design, he may yet recover damages against

such of the defendants as are shown to be guilty of a tort, directly resulting in damages to the plaintiff.''

Also see *McClintock v. McClure,* 171 Ky. 714 (188 S. W. 867, Ann. Cas. 1918E, 96) ; *Gordon v. McLearn,* 123 Ark. 496 (185 S. W. 803, Ann. Cas. 1918A, 482) ; *Ratcliffe v. Walker,* 117 Va. 569 (85 S. E. 575, Ann. Cas. 1917E, 1022) ; *Harvey v. Harvey,* 75 Neb. 557 (106 N. W. 660) ; *James v. Evans,* 149 Fed. 136 (80 C. C. A. 240) ; *Collins v. Cronin,* 117 Pa. St. 35 (11 Atl. 869) ; 12 C. J. 646.

■ In the instant action there is no evidence of conspiracy. Each of the defendants was a separate and independent financial institution dealing in automobile paper purchased from or pledged by the plaintiff. The mere fact that consultations were held by representatives of these two defendants relative to the status of plaintiff's account and that they acted at approximately the same time to protect their respective interests because of duplication of securities does not warrant the inference of plaintiff that a conspiracy existed to injure his business, as charged in the complaint. The charge of conspiracy must be based upon something more substantial than suspicion.

■ Having concluded that there is no evidence of conspiracy, we shall next consider the evidence pertaining to each of the defendants to ascertain whether it would support a judgment against either of them.

If we eliminate the question of conspiracy, the sole complaint against the defendant bank is that it wrongfully refused to cash checks drawn by the plaintiff and thereby injured the latter's credit. While plaintiff charges that the bank ''returned various checks of plaintiff marked 'Insufficient Funds', the undisputed evidence is that the bank failed to honor only one check, that drawn in favor of the Roy Burnett Motors for $836.28. Prior to the presentation of this check, the

bank had applied plaintiff's general deposit in the amount of $864, in partial payment of two notes executed by plaintiff in its favor which the bank asserts were past due. One, dated August 24, 1931, was for $750; the other, dated September 9, 1931, was for $250. Both were thirty-day notes bearing eight per cent interest. As security for these two notes, plaintiff pledged as collateral certain conditional sales contracts—representing sales of automobiles. On September 17, 1931, the bank notified plaintiff that the $750 note would be due on September 24, 1931. Plaintiff claims that, at this time, he called at the bank and made arrangements for consolidation of the two notes and extension of time of payment. Plaintiff testified that Mr. Carpenter, president of the bank, told him that "as long as I kept my collateral up and kept my interest up he would renew that note. * * * He said the consolidation of these two notes was satisfactory to him and that that was a good way to do it". If such an agreement was made, we think there was no consideration for it. Furthermore, it was indefinite and uncertain. At any rate, plaintiff is not in a position to enforce this alleged agreement for it appears without contradiction that the interest was not "kept up" and that some of the collateral pledged was not what, on its face, it purported to be.

■ Assuming that the indebtedness of the plaintiff to the bank had matured, did the bank have the right to make such application of the money on deposit, in view of the collateral security held by it? Otherwise stated, could the bank exercise the right of set off without first having exhausted the collateral pledged by the plaintiff? It is clear that but for the collateral security the bank would have been entitled to set off a general deposit against a matured indebtedness. See 7 C. J.

653 and 3 R. C. L. 588 wherein numerous authorities are cited. What is the rule when the indebtedness is protected by collateral? There are few authorities on the precise question and they are in conflict, but the prevailing view seems to be that, when not controlled by statute or by contract—the right of set off is not affected when the debt is secured. The well reasoned case of *Harper v. First State Bank of Grand Prairie* (Tex.), 3 S. W. (2d) 552, wherein the authorities from other jurisdictions are reviewed and criticised, supports the conclusion herein reached. Also see Paton's Digest of Legal Opinions and Banking Law, § 4347a. If it be considered that a bank has a general lien on open deposits to secure a matured indebtedness of a depositor, although strictly speaking it is a right of set-off, we see no logical reason why it should be deprived of such right merely because it also has a special lien by virtue of having been given collateral to secure such indebtedness. Whatever may be the diversity of opinion relative to this question, we take it that where the collateral is not what it purports to be, as in the instant case, the bank has a clear right of set off.

It appears beyond dispute that some of the collateral placed with the bank in the form of conditional sales contracts purporting to vest in the bank title to the automobiles therein described was secondary to the lien of the defendant Commercial Credit Company, as conditional sales contracts covering the same automobiles had previously been sold and assigned to it. It is true that plaintiff made the bald statement that the bank understood the nature of these transactions and knew that such conditional sales contracts did not vest title in it, but we submit there is no evidence tending to show a waiver of the terms of these instruments. Whether intentional or not, a fraud on the bank was

perpetrated by the plaintiff. Under such circumstances, no wrong was committed by the bank in applying plaintiff's general deposit to part payment of his past due notes. Hence, we conclude it was proper to grant the motion for involuntary nonsuit as applied to the defendant bank.

■ We now direct attention to the alleged wrongful acts charged against the defendant Commercial Credit Company. As before stated, the evidence affirmatively shows that plaintiff had pledged with the bank certain conditional sales contracts covering automobiles to which the Credit Company held title. Furthermore, when plaintiff failed to remit to the Credit Company the proceeds from the sale of a certain new car, it clearly violated the terms of the trust receipt held by the finance company covering this car. This new car was sold off the floor to a Washington purchaser named Woodcock. We find from the undisputed record that, after this sale without remittance from Keller, the L. M. Keller demonstrator was sold to one Momberg. In the conditional sales contract were inserted the manufacturer's serial number (P A 31736) and motor number (1598075) of the car sold to Woodcock as shown by the trust receipt. However, on the order slip of the Momberg car appeared the true number of the demonstrator (1590041). When plaintiff prepared the conditional sales contract for the Momberg deal—with the order slip before him—how did it happen that he took the serial number and motor number shown on the trust receipt covering the Woodcock car? Was it all a mistake? Or was the plaintiff trying to conceal from the Credit Company the fact that he had sold a car covered by a trust receipt and failed to remit for it? To the writer there seems but one reasonable inference to be drawn and that is not favorable to the plaintiff.

True, defendant, after learning the status of plaintiff's account with the bank and the numerous breaches of contract on his part, demanded additional trust receipts on second hand cars and placed a representative or watchman in plaintiff's place of business in order that it might be advised as to what sales, if any, were being made. We think the finance company was acting strictly within its rights in so doing. Under the terms of the trust receipts, it could have repossessed all the new cars on the dealer's floor had it so desired, but it was persuaded by plaintiff to leave them for the purpose of sale. There is no evidence tending to show that defendant, through force or otherwise, "took over plaintiff's automobile business". As a matter of fact, plaintiff continued to do business. It is conceded that there is evidence to the effect that the defendant, through its representative Hoey, threatened the plaintiff with arrest and imprisonment because of the alleged conversions. The evidence, however, does not disclose that the additional security obtained from plaintiff was the result of force or duress. Neither does it appear that the plaintiff lost any business as a result of any wrongful act on the part of the defendant.

It would greatly extend this opinion further to review the evidence in the voluminous record in this case. We have given it careful consideration and must be content to state our general conclusions therefrom. It is believed that the Credit Company, in the light of admitted conversions, did only those things which it had a right to do. The charges in the complaint are far stronger than the proof.

The judgment of the lower court is affirmed.

CAMPBELL, C. J., and ROSSMAN and KELLY, JJ., concur.