Argued March 10, reversed without costs June 4, 1958

# SECURITY & INVESTMENT CO. *v.* LOCKS TOWING

326 P. 2d 439

*Norman E. Sutherland*, Portland, argued the cause for appellants. On the brief were White, Sutherland and Parks, Portland.

*Clifford S. Beckett*, Oregon City, argued the cause and filed a brief for respondent and cross-appellant.

Before PERRY, Chief Justice, and ROSSMAN, WARNER and MCALLISTER, Justices.

PER CURIAM.

This is an appeal in a suit for an injunction restraining the alleged continuing trespasses of the defendants upon property in Oregon City and for general and punitive damages. From a joint and several judgment against the defendants Ramona Towboat Company, Inc., Shaver Transportation Company, Joe Bernert, Albert Bernert and Gale Edwards, in the amount of $3,000, and a decree enjoining their further trespass on the property in controversy, these parties appeal and the plaintiff cross-appeals, claiming that it is entitled to the sum of $4,500 as mesne profits and $25,000 as punitive damages. The decree dismissed the complaint as to the defendants Publishers' Paper Co. and Locks Towing Co., Inc.

The property upon which the alleged trespasses occurred is between Water Street and the Willamette

River, lying south of the westerly extension of the south line of Eighth Street and lying north of the westerly extension of the south line of Fourth Street, in Oregon City. Water Street is now known as McLoughlin Boulevard.

The record owner is the plaintiff corporation which holds the title in trust for members of the Latourette family in which the late Justice EARL C. LATOURETTE apparently had the largest interest at the time of trial. During the course of the trial it was generally referred to by the witnesses as the Latourette property. We will, therefore, so describe it.

As the foregoing description suggests, the Latourette property is divided into two parcels. The southerly parcel extends northward and down the river from the extended southerly line of Fourth Street to approximately what would be the northerly line of Fifth Street if extended. The northerly parcel extends upriver and southward to a point which is approximately on the northerly line of Sixth Street if extended westerly. The northerly parcel is bisected near the middle by the easterly end of the bridge over the Willamette River, connecting Oregon City on the east with the town of West Linn on the west side.

The two parcels are separated by a strip of land of substantially the same character at river level. This is owned by the state of Oregon and by it leased to towboat operators for the same uses as that for which the property above described is used.

Immediately south and adjoining the first, or southerly, parcel is the property of the defendant Publishers' Paper Co., successor to the Hawley Pulp and Paper Company. That part which lies along the river is also available to and used by the towboat operators for the temporary moorage of log rafts.

The Latourette property, as well as all other river property immediately to the south and north of it, is a narrow strip at the river level with a wall or steep cliff to the east extending sharply upward to the level of the bordering McLoughlin Boulevard. As described in one of the briefs, "in spots it shelves off gradually and it is conceivable that a small structure or house could be constructed in one or two locations near the water's edge." The property involved has eye-bolts anchored in rocks or cliffs with lines or cables extending to the water and anchor logs, all designed for the tying of log rafts. This is true of some of the properties of others which lie near it.

Both the land owned by Publishers' Paper Co. and the southerly parcel of the Latourette property are below the Willamette Falls. Both are more or less opposite the northerly entrance to the government locks on the west side of the river. These locks are operated to assist river transportation around the barrier created by the falls.

The locks and these natural conditions give rise to the towboat activity in this area from whence come the alleged acts of trespass upon the Latourette land.

The principal activity of towboats in this vicinity is to transport large log rafts to points as close as possible to the north or downstream entrance to the locks. Here they are temporarily moored at convenient spots along the east and west sides of the Willamette River where they remain until they are "brailed" by other towboat owners who then convey them thence to the lock entrance where they are turned over to the Locks Towing Co., which assumes full responsibility for their transport through the locks. At the southerly lock entrance above the falls they are then

received by other towboat companies which convey them from that point to the ultimate point of delivery.

"Brailing," as used by the witnesses, is the process of breaking down a given large raft at the point of last moorage or narrowing it so the rafts are of a size permitting easy passage through the locks. Substantially the same operation is repeated at the upstream end of the locks for the passage of log rafts for delivery at river points downstream from the locks. As to downstream rafts the brailed units, called by some witnesses, "lockages," are received at the northerly end of the locks by one of the towboat companies, then conveyed to a nearby point along the river and reassembled at that point into their former larger units and thereafter delivered to other boat operators, who take them downstream to the points of delivery on the river.

It is out of these upstream and downstream brailing operations that arise the occasions to tie rafts to adjacent river property and from whence grow the trespasses alleged to have been committed on the Latourette property.

For some ten years prior to April 1, 1951, the beginning of the alleged trespasses, the plaintiff had leased the property first to the Shaver Transportation Company, one of the appellants, and later to Hawley Pulp and Paper Company, predecessor to Publishers' Paper Co. The latter lease provided for a monthly rental of $150.

The testimony shows that the rental stipulated in the lease, at least for the last years thereof, was borne equally by the Shaver Transportation Company, Ramona Towing Co., Knappton Towboat Company and Sheppard Towing Company, although none were parties to the lease. The contributions of these four companies were paid directly to the Paper Company lessee, which, in turn, paid them to plaintiff.

After the termination of the lease on April 1, 1951, no new lease was entered into by plaintiff with the Paper Company or with any of the defendants previously using the same, nor with any other towboat company. It is plaintiff's contention that, notwithstanding the absence of any agreement or permit, the defendants conspired to continue to use the premises as theretofore by rafting poles and logs to its property without its consent and without payment of any compensation for such use and all in denial of plaintiff's use and possession.

Upon conclusion of plaintiff's case in chief, defendants declined the opportunity to introduce any evidence in their behalf.

The record reveals that before and after April 1, 1951, there were at least eight towboat companies or parties operating in the vicinity of the Latourette property, any one of which could have conceivably had their employees tie up to the property in controversy. These were the Shaver Transportation Company, Ramona Towboat Company, Knappton Towboat Company, Sheppard Towing Company, Western Transportation Company, a subsidiary of Crown Zellerbach Company, the largest paper manufacturing plant above the locks on the west side of the river, the Publishers' Paper Co., with operations on the east bank of the Willamette River above the falls, and Joe Bernert and Albert Bernert, brothers, but operating, apparently, individually, both above and below the falls. Possibly, we should also add the defendant Gale Edwards, who stated that he was a "towboat operator," but who apparently only worked for and under the direction of the defendants Albert Bernert and Locks Towing Co. The record is not clear whether his reference to himself as a "towboat operator" included the ownership

and operation of boats owned by him or just the operation of boats for others. The defendant Locks Towing Company's operations, as we have observed, were limited solely to the transport of log rafts from one end of the locks to the other.

Only five of these eight potential users of the Latourette property and like properties along the river were made parties defendant and only two of these defendants, that is, the Shaver Transportation Company and Ramona Towboat Company, were of the four towboat companies which were equal contributors to the monthly rental payments reserved by the lease expiring on April 1, 1951. These four were presumptively at least the only users of the Latourette property before April 1, 1951.

Thus, out of a field of eight companies or persons actively engaged in towing log rafts to and from the area below the falls and the downriver entrance to the West Linn locks, only five were made parties defendant, leaving the court to speculate, in the absence of particularly pointed evidence, which one of the five trespassed on the Latourette land or whether it might not have been one or more of the other three towboat companies which are not parties to the suit.

The court very properly dismissed the suit as to the defendants Locks Towing Co. and Publishers' Paper Co. for want of sufficient evidence to charge them with wrongful use. We think it should have done likewise as to the remaining defendants and for the reasons that follow.

The nature of the trespass to the property for which damages are claimed is limited by Judge LATOURETTE's testimony to acts of tying log rafts to the land. His testimony also nullifies the allegation of the complaint that plaintiff has been denied ingress to or

egress from the property by the presence of the log rafts. At page 33 of the transcript we find the following question propounded and Judge LATOURETTE's answer:

"Q  Has there ever been a situation in which you wanted to gain ingress and egress to this property and were prevented by log rafts?
"A  No, no, never."

Thus, the issues are narrowed to a consideration of who were the trespassers tying rafts to the property and how often and when.

There is abundant evidence suggesting a possible use of the Latourette property after April 1, 1951, by various persons or towboat companies. This, in the main, comes from witnesses called by plaintiff who frequently saw from the bridge or points on Water Street, now called McLoughlin Boulevard, log rafts near or in front of the property but who could not say from such distant observation that they were tied to the property. Some rafts which might appear in front of or close to the property could well have been rafts tied to the Publishers' dock and land immediately to the north of the Latourette property, or to the state's parcel, which the current had swung into the position in front of the Latourette parcels, where the observers saw them.

There are only three instances of positive proof that any rafts were tied to the Latourette property. They were on September 24, 1952, September 11, 1953, and September 16, 1953. These instances are supported by photographs and the testimony of several witnesses, some of whom went to the river level at the request of Judge LATOURETTE to make a personal inspection. But this proof is limited to three separate rafts. Except for the Bernert use, to which we will later refer,

and even assuming that all rafts seen by the other witnesses were actually moored at the Latourette property when observed from afar or near, there is not one iota of evidence to tell us who or what towing company of the potential eight operators was responsible for the trespass. Granted, that on one occasion certain logs were discovered bearing the mark of Crown Zellerbach Company, it is not the ownership of the logs that identifies the party who placed them there.

Not only must acts of trespass be proved, but also the fact that the defendants were responsible for them. In the instant matter, such proof of that character goes to but one single instance by only one of the defendants.

■ The plaintiff pleads that the defendants acted individually and collectively and in concert and "did conspire to, at diverse times, enter * * * the property of plaintiff and to obstruct the ingress and egress thereto by rafting poles and logs thereto and thereon * * *" to plaintiff's damage.

■ Only as conspirators are the defendants jointly and severally liable for all damages resulting from a conspiracy. 15 CJS 1028, Conspiracy § 18. But proof of the conspiracy is essential for a joint and several judgment against all of them. *Keller v. Commercial Credit Co.*, 149 Or 372, 375, 40 P2d 1018, 96 ALR 1235, and cases there cited. Also see 15 CJS, supra, at p 1040 § 26. A judgment based on conspiracy is a unit and if erroneous for want of evidence, such a judgment cannot be sustained. A charge of conspiracy must be based on something more than suspicion. *Keller v. Commercial Credit Co.*, supra. But here there is an absolute want of competent evidence that the defendants, or any two or more of them, were acting in concert or pursuant to any conspiracy to enjoy the use

of the Latourette property without payment to the owner of any compensation for such misuse. There is, therefore, nothing to support the joint and several judgment entered by the trial court. This factor alone dictates the necessity for a reversal.

What we have hereinabove said concerning plaintiff's want of evidence as to the identity of the trespassers shatters any suggestion to a claim of continuing trespass on the part of any one of them and, therefore, to the right of injunctive relief.

■ Even though the allegations of conspiracy are not sustained, damages may be recovered against each or any of the defendants shown to have been guilty of a tortious act. *Gabriel v. Collier,* 146 Or 247, 255, 29 P2d 1025; *Keller v. Commercial Credit Co.,* supra, at p 375. We, therefore, revert to the single clearly proven instance of trespass by a given defendant. We find in the testimony of defendant Gale Edwards, who, as we have said, at the time of trial and before, was a tugboat operator working alternatively for defendants Albert Bernert and Locks Towing Co. and the testimony of defendant Albert Bernert that on one occasion in September, 1952 or 1953, a raft which Edwards was towing for Bernert was by mistake tied to the Latourette property below the bridge. Upon learning of this error, they went immediately to the office of plaintiff's attorney, Mr. Beckett, told him about it and there offered to pay for the use, asking him to send a bill. Bernert did not know exactly how long the raft was there, but said that rafts are generally never tied to one place longer than 24 hours before going through the locks. There is nothing in the record to contradict the testimony of Mr. Edwards and Mr. Bernert in this respect, nor does it tell us whether Bernert was after-

ward billed or what disposition, if any, was made of the offer of payment.

If we resolve the Bernert damage in terms most favorable to plaintiff, that is, in terms of what plaintiff seeks for use of all the Latourette parcel, $150 per month, then one full day's use would be approximately $5. Under the circumstances, we feel justified in ignoring such a trifling matter and apply the rule De minimis non curat lex. Moreover, this was the apparent attitude of plaintiff when the defendants above named voluntarily called their inadvertent trespass to plaintiff's attention, offering to make restitution.

There is no question in our minds that there has been an illegal use of plaintiff's property by parties towing log rafts on the river and for which use plaintiff was entitled to compensation. But the weakness in plaintiff's case, which we cannot hurdle, is the want of sufficient, competent evidence to enable us to say which of the defendants accused, if any, were guilty of these evident trespasses. The very nature of the property, being, as it is, a narrow ledge alongside the river bank, with a precipitous wall arising therefrom on the east to the street level high above, makes it difficult and expensive to police against the invaders who operate both in the night and day. We are, therefore, not surprised that plaintiff found it difficult to marshal evidence of the kind demanded to sustain its case and obtain the species of relief to which, in abstract, it seems to be entitled.

Because of our conclusion respecting the insufficiency of the proof of the identity of the trespassers and the existence of the alleged conspiracy, we find no need to give attention to any other propositions urged by the defendants on this appeal.

The decree of the trial court is reversed. Each party to bear its own costs.