[No. 31499. Department One. May 24, 1951.]

MARGARET MARY DONALDSON, *Appellant,* v. VICTOR GREINER DONALDSON, *Respondent.*[1]

*Russell H. Fluent,* for appellant.

*Chavelle & Chavelle,* for respondent.

BEALS, J.—Plaintiff herein, Margaret Mary Donaldson, and the defendant, Victor Greiner Donaldson, intermarried at Columbus, Georgia, May 20, 1945. May 11, 1949, plaintiff

[1]Reported in 231 P. (2d) 607.

filed in the office of the clerk of the superior court for King county a complaint alleging the marriage of the parties; that one child had been born to them, a son then fourteen months of age; that the parties owned a small amount of personal property consisting of household goods and an inconsiderable bank account; that, for the period of eight months preceding the filing of her complaint, the defendant had been guilty of cruel treatment of plaintiff in that he had heaped personal indignities upon her, had remained away from home almost every evening and, since September, 1948, had indulged in intoxicating liquor to excess; that he had maintained toward plaintiff a "cold and unfriendly attitude of inconsideration and animosity," had told plaintiff that he no longer cared for her and had lost all love and affection for her, and that "he was through."

Plaintiff further alleged that the defendant was employed by Sick's Seattle Brewing and Malting Company, receiving a salary of three hundred dollars a month; that plaintiff was without funds, and that one hundred dollars a month was a reasonable sum to be allowed her as permanent alimony for the support of herself and the infant child of the parties.

Plaintiff prayed for a decree divorcing the parties; that she be awarded custody of the child; that the household goods be awarded to her, and that defendant be required to pay plaintiff one hundred dollars a month for the support of herself and the child, together with her attorney's fees in the action.

By his answer, the defendant admitted the marriage, the birth of the child, the ownership of community property as alleged by the plaintiff, and that he was employed as alleged in the complaint.

By way of a cross-complaint, the defendant alleged that plaintiff had subjected him to cruel treatment and personal indignities rendering his life burdensome, without fault on his part, and that it was impossible for the parties longer to live together as husband and wife, asking that plaintiff's complaint be dismissed; that defendant be awarded a di-

vorce, together with the care and custody of the minor child of the parties, and that the court make equitable disposition of the property owned by the parties, also praying for equitable relief.

By her reply, plaintiff denied the allegations of defendant's cross-complaint, save as admitted by the allegations of her complaint.

After hearing the evidence introduced by the respective parties, the trial court entered findings of fact and conclusions of law in favor of the defendant to the effect that the defendant was entitled to a divorce upon the ground that, at the time the parties were married, plaintiff refused to tell the defendant that she had renounced the Catholic faith and that she was then a member of the Communist party, and upon the further ground that

" . . . plaintiff did not give up her belief in the principles of communism, but maintained an active interest with communists to the extent of inviting them into the home of the plaintiff and defendant and refused to eliminate such associations in spite of the defendant; that by reason of her belief in the principles of communism and her associations, defendant was embarrassed and ridiculed and an atmosphere of turmoil and dissension was thereby created in the home of the plaintiff and defendant, and making it impossible for the defendant to maintain a normal marital relationship."

The court further found that the plaintiff's evidence was insufficient to justify granting her a divorce; that defendant had not been guilty of cruel treatment of plaintiff; that the community property of the parties consisted of household goods of the approximate value of five hundred dollars; that the defendant had a good position, earning approximately three hundred dollars a month, and that one hundred dollars a month was a reasonable sum to be allowed plaintiff for the support of the minor child of the parties during the periods when plaintiff had the child in her custody.

The court then entered conclusions of law in favor of the defendant, followed by a decree, filed May 15, 1950, granting the defendant a divorce from plaintiff, dismissing plaintiff's

complaint, awarding the personal property to the plaintiff, providing that the plaintiff be awarded custody of the minor child of the parties for a period of twelve months from May 15, 1950, awarding such custody to the defendant for the following year, and alternating the custody between the parties for yearly periods until May 15, 1954, the court retaining jurisdiction of the cause and directing that, at the expiration of the last period for which custody of the child was awarded, the matter of the permanent custody of the child be then presented to the superior court upon application of either party.

The decree further provided that, while the minor child was in plaintiff's custody, the defendant should pay plaintiff one hundred dollars a month, commencing with the month of May, 1950, subject to further order of the court.

The decree also provided that, while the minor child was in plaintiff's custody, plaintiff should, upon the child's reaching an appropriate age, cause him to attend Sunday school, and a public, parochial or other recognized school, and required plaintiff to refrain from educating or training the child to become a communist or teaching him a disbelief in the existence of God, further directing plaintiff to teach the child love and respect for the United States of America. The decree continued by directing that, while the child was in plaintiff's custody, the defendant should be allowed reasonable rights of visitation and to have the minor child with him during certain prescribed hours each week and at other reasonable times, and that, while the child was in defendant's custody, the plaintiff should have reasonable rights of visitation and be allowed to have the child with her during certain specified periods. The plaintiff was allowed an attorney's fee and also allowed her exceptions to the entry of the decree.

From this decree, the plaintiff has appealed, making the following assignment of errors:

"(1) The court erred in denying plaintiff's motion for judgment N.O.V. and for a new trial.

"(2) The court erred in denying plaintiff a divorce on the ground of cruelty and personal indignities.

"(3) The court erred in not granting plaintiff a divorce from defendant on the ground of habitual drunkenness.

"(4) The court erred in refusing to sign plaintiff's proposed findings of fact and conclusions of law, or equivalent findings and conclusions.

"(5) The court erred in entering a decree granting the defendant a divorce.

"(6) The court erred in decreeing split custody annually, depriving plaintiff of the care, custody and control of her minor son one year out of every two years for the next four years, and in granting custody of said minor son to the defendant every other year for the next four years, and in leaving his further custody thereafter to another hearing on application of either party.

"(7) The court violated Article 1, section 11, Amendment 4 of the Constitution of the State of Washington relating to religious freedom.

"(8) The court violated Article 1, sections 3, 4, 5, 6 and 12 of the Constitution of the State of Washington.

"(9) The court violated the first and 14th amendments to the Constitution of the United States."

During the late war, respondent served for forty-five months in the army and was honorably discharged as a second lieutenant. Appellant and respondent met in New York City during the year 1944, when respondent was stationed in New Jersey. At that time, appellant was employed in the city of New York as an organizer for the United Office and Professional Workers' Union, having been previously employed by publishing companies as a clerk and typist. The parties having become engaged, in May, 1945, appellant went to Columbus, Georgia, where respondent was then stationed, and they were married there by a justice of the peace. After respondent's discharge from the army, the parties for a time resided in California, then removing to Seattle where their son was born during the month of February, 1948, the child being twenty-six months old at the time of the trial of this action. From September, 1947, until November, 1948, the parties resided in an apartment, taking possession of the home of respondent's father at the latter date.

Respondent is employed as cashier by Sick's Seattle Brewing and Malting Company at a salary of approximately three hundred dollars a month, respondent testifying that his duties include auditing the night cashier's receipts, frequently amounting to many thousand dollars, entering the accounts in the cash book, and preparing the daily bank deposit which sometimes amounts to as much as one hundred fifty thousand dollars in one day.

For a time, appellant was also working, being employed in office work for the Longshoremen's and Warehousemen's Union, and the Washington State Industrial Union Council.

At the trial, appellant testified on her own behalf, and called two of her lady friends as witnesses.

Appellant testified that, prior to and after the birth of the child, respondent drank intoxicating liquor to excess and, instead of reaching home at the normal hour of 5:30 p. m. or a little later, he frequently would not come home for dinner, failing to advise appellant that he would be absent, and would come home late "under the influence of liquor to either a limited extent or intoxicated." She further testified that, upon inquiry as to where he had been, respondent would either refuse to explain or would say that he had "stopped for a few beers" or words to that effect, and that, for a period of months, respondent would arrive home late three or four times a week.

During March and April, 1949, appellant, with the baby, visited her parents who lived on Staten Island in New York harbor. She testified that, upon her return, she found three or four cases of empty beer bottles and two or three empty whisky bottles in the basement. Appellant testified that, for a short time after her return, the domestic situation was pleasant, but that respondent soon resumed drinking and became sullen in his attitude toward her. She testified that respondent told her that he did not care for her; that there was no sound basis for their marriage, and that it would be all right with him if they were divorced, but that he would keep the child. She further testified that, after a week or

so of this relationship, she, with the baby, moved from the home and instituted this action.

Appellant called as one of her witnesses Lillian Rubicz, who testified that she was divorced and had children of her own; that she had known appellant for about a year; that for a few weeks the witness and her children had lived with appellant, and that appellant was a person of good moral character and took good care of her child.

Appellant also called Jean Rutherford, who had known appellant since December, 1948, and was quite well acquainted with her. The witness testified that appellant was a woman of excellent character and took good care of her baby, but that she had not discussed her marital affairs with the witness.

Respondent also called Miss Rutherford, who testified that, after December, 1948, she frequently visited the home of the parties while they were still living together, and that she had been in the house occasionally during evenings when respondent came home at about seven o'clock or later. When asked, "Did you ever see him in an intoxicated condition?" the witness answered: "No."

No witness, save appellant, testified that respondent indulged in intoxicating liquor to excess. Appellant testified that at times respondent came home under the influence of liquor, but this he denied. Appellant introduced in evidence seven photostatic copies of checks drawn by respondent during the fall of 1949, after the parties had separated, five of the checks being for five dollars, one for ten and one for two dollars, all of which respondent had cashed in restaurants or taverns. These checks prove nothing, and we are convinced, as was the trial court, that the record fails to support appellant's contention that respondent drank to excess.

During the trial, considerable testimony was introduced concerning appellant's political and religious beliefs. Apparently, her family were members of the Catholic church, in which she was baptized. In answer to a question as to whether she had renounced her church, appellant answered: "No, sir; I just haven't practiced it for a number

of years." Asked if she thought a minor child "should practice some kind of religion when it becomes old enough to do so," appellant answered that, if a child wished to "participate in religion," it should be allowed to do so, and that a healthy child should be permitted to make its own decision. The witness stated that, concerning her child's religious or political beliefs, she would allow him to "make his own decisions."

During the course of the examination of the witness, after argument concerning a question propounded by respondent's counsel, the court asked the witness: "Are you a Communist?" Appellant's counsel objected to the question and the court advised her that she did not have to answer, but the witness then answered: "I am not a Communist." Appellant denied that she had discussed communism with certain of her acquaintances, and testified that she had joined the Communist party while living in New York in 1942 or 1943, and that, in August, 1946, she wrote to the "membership director" of the Communist party in New York, telling "them I was resigning my membership, and I no longer wished to be affiliated, and that was it." She testified that she gave the letter to her husband to mail, but that she never received any answer nor did she ever rejoin the party, and that she had not attended any communist meetings. Respondent testified that he never saw such a letter. Asked by the court if, in the event she and her husband were divorced, she expected to rejoin the Communist party, appellant answered: "I do not know whether I would or not."

Appellant was cross-examined as to her acquaintance with a number of individuals, testifying that she was acquainted with most of the people named because they belonged to the union with which she was connected. She denied that any of the group were intimate friends of hers, with the possible exception of one married couple. She also testified that respondent had not objected to her association with the people named and had himself voluntarily associated with them, and that, on one occasion when she was

absent from the city, respondent had visited the home of the couple mentioned.

Respondent testified that, at the time of their marriage, he was not aware that his wife was a member of the Communist party, thinking that she was merely liberal in her political views; that, during the summer of 1946, in answer to his question, she admitted that she was a member of the party; that appellant was always interested in political affairs, and that, under fictitious names, she wrote letters to Congressmen protesting the Atlantic Pact and other matters pending before Congress. Respondent further testified that he wished appellant to resume her status as a member of the Catholic church, stating that he was a Protestant but had considered joining the Catholic church, and that he wished his child to be baptized and reared a Christian.

In his brief, respondent states the reasons for granting him a divorce are

". . . deception and violated promises after marriage as follows: (1) Appellant refused to tell respondent at the time he was married that she had renounced the Catholic faith; (2) Appellant failed to tell the respondent at the time she was married that she was a communist and a member of the Communist Party; (3) Subsequent to the consummation of the marriage between the appellant and respondent, appellant failed to give up her belief in the principles of communism, attended meetings of communists, and invited them into her home, and this course of action, although appellant promised to discontinue it, continued during the course of marriage, and respondent's resistance to this course of action was futile."

As to the first reason assigned, it does not appear that, prior to the marriage, respondent asked appellant concerning her religious belief or that she had told him that she ever had been a Catholic. As appellant evidently produced her baptismal certificate when applying for the marriage license, respondent must have known that she had been baptised a Catholic and, before long, he certainly must have known that she was not maintaining her status as a member of that church.

As his second claim of deception, respondent complains because appellant failed to inform him at the time of their marriage that she was a member of the Communist party. It nowhere appears that respondent asked appellant concerning her political opinions, and he admits that, while the parties were residing in California, appellant told him that she was a member of the Communist party. The record does not disclose any deception on appellant's part.

Respondent then complains that, after the marriage of the parties, appellant failed to give up her belief in the principles of communism, attended communist meetings, and invited communists to their home, in spite of her promise to "discontinue" that course. He vehemently complains of appellant's friendship with persons named in the record, testifying that some of these persons were admitted communists. Apparently, one couple of whom he complains had been friends of his parents and, when the parties to this action moved out of their apartment and into the home of respondent's father, these friends moved into the vacated apartment. This couple visited respondent's home, and respondent testified that, while appellant was visiting her parents, he went to a party at their home, contributing two bottles of whisky to the entertainment. Respondent testified that he had accompanied his wife to parties at the home of some of her friends, but refused to visit their homes after several of them had endeavored to convert him to communism.

Appellant testified that she and respondent had no close mutual friends; that her friends were persons she had met in the course of her employment; that several of her acquaintances had never been in her home; that many of her associates were members of the labor union to which she belonged, and that she did not know whether or not these people were communists.

Appellant's testimony in this connection is not convincing, but the matter is of little importance.

During the period when appellant and the child were visiting her parents in New York, appellant and respondent

corresponded, four of appellant's letters having been introduced in evidence by appellant, with two of respondent's. These letters all contain endearing terms and, with the exception of the last letter written by respondent, dated April 17, 1949, contains no suggestion whatever of any dissension between the parties. Each missed the other; and was anxious to be reunited. The last letter which respondent wrote, although commencing with "Darling," and ending "love," indicated that respondent, at least, was dissatisfied with the status of the marriage relation between the parties. While writing that he missed appellant and the baby, he also said that "there is still no solution in sight."

■ Neither a religious belief (or the lack of such belief) nor a political or social opinion is of itself ground for divorce in this jurisdiction. In determining actions for divorce, courts of this state are limited by the grounds stated in Laws of 1949, chapter 215, § 2, p. 698, Rem. Supp. 1949, § 997-2. The only one of the grounds enumerated in this statute which can possibly apply to such a situation as is here presented is subd. (5) which reads: "Cruel treatment of either party by the other, or personal indignities rendering life burdensome."

Concerning the application of this subdivision of the section to the facts in the case at bar, it may be observed that, in the case of *Braun v. Braun*, 31 Wn. (2d) 468, 197 P. (2d) 442, we said:

"The trial court apparently and properly disregarded the charges that the appellant was a Communist, which certainly would not constitute cruelty *per se* and be grounds in itself for a divorce."

In the case of *Neff v. Neff*, 30 Wn. (2d) 593, 192 P. (2d) 344, it appeared that the husband brough suit for divorce, the wife filing an answer and a cross-complaint asking that she be awarded a divorce. The trial court granted the plaintiff an interlocutory order of divorce, from which the wife appealed, contending that the divorce should not have been awarded to the husband but should have been awarded to her, and also assigning error upon the trial court's distribution of the property. This court, being of

the opinion that neither party to the action had "established one of the statutory grounds for divorce," reversed the interlocutory order appealed from and remanded the cause with instructions to dismiss the plaintiff's amended complaint and defendant's cross-complaint.

In *Fix v. Fix*, 33 Wn. (2d) 229, 204 P. (2d) 1066, this court, on appeal by the defendant husband from an interlocutory order of divorce granted to the plaintiff upon the ground of cruelty, held that the findings of the trial court were not supported by the weight of the evidence and reversed the order from which defendant had appealed. In the course of the opinion, we said:

"The courts are limited in granting divorces to the nine grounds for divorce listed in the statute. If the legislature, in its wisdom, sees fit to provide other grounds, that is its privilege. We cannot make laws. We can only apply the laws which the legislature makes to the facts in a particular case."

Consideration of the facts in the case at bar, as disclosed by the record before us, together with the authorities above cited, convinces us that the trial court correctly dismissed appellant's complaint seeking a divorce from respondent, and erred in granting the prayer of respondent's cross-complaint and awarding him a decree of divorce, the evidence disclosing no ground for the entry of a decree of divorce in favor of either party to the action.

The decree appealed from, awarding respondent a divorce and containing other provisions appropriate to the awarding of a decree of divorce in respondent's favor, is accordingly reversed, and the cause remanded, with instructions to vacate the decree from which appellant has appealed and to enter an order dismissing appellant's action for divorce and also dismissing respondent's cross-complaint praying that a decree of divorce be awarded to him.

SCHWELLENBACH, C. J., HILL, GRADY, and DONWORTH, JJ., concur.

---

July 9, 1951. Petition for rehearing denied.