[No. 37539.   Department Two.   September 30, 1965.]

MARY MESSINA et al., *Appellants*, v. RHODES COMPANY
et al., *Respondents*.*

*Burkey, Marsico & Rovai*, by *Robert L. Rovai*, for appellants.

*Williams, Lanza, Kastner & Gibbs*, by *James A. Noe*, for respondents.

DONWORTH, J.—This is an appeal from a judgment of dismissal entered after sustaining defendants' challenge to the sufficiency of the plaintiffs' evidence interposed at the end of plaintiffs' case.

The trial court also denied plaintiffs' motion for a new trial. The judgment stated as the court's reasons for dismissal that it had "ruled as a matter of law" that

plaintiffs did not produce substantial evidence to support their claim, and in addition, and in any event, the

*Reported in 406 P.2d 312.

plaintiff wife was contributorily negligent as a matter of law . . . .

The action was brought to recover for injuries sustained by the plaintiff wife (herein referred to as appellant) when she slipped and fell on a wet floor while shopping in Rhodes department store in Tacoma, which is owned and operated by respondents. In their answer, respondents admitted that appellant entered their place of business and fell near the main entrance, but denied the other allegations of the complaint. As affirmative defenses, respondents alleged that (1) appellant had assumed the risk involved, and (2) any injuries sustained by appellant were proximately caused or contributed to by her own negligence.

The case was tried before the court sitting with a jury. As above stated, the trial court ruled that appellant had failed to establish a prima facie case of negligence on the part of respondents, and, in addition, that appellant was contributorially negligent as a matter of law.

■ With regard to cases which are dismissed at the close of the plaintiff's evidence on the grounds above stated, the applicable rule (which has been many times stated by this court) was applied in *Miller v. Payless Drug Stores*, 61 Wn.2d 651, 653, 379 P.2d 932 (1963). We there said:

> A motion for nonsuit admits the truth of the evidence, and all inferences arising therefrom, of the party against whom the motion is made. It requires that the evidence be interpreted most strongly against the moving party and most favorably to the opposing party. It is only when the court can say that there is no evidence at all to support the plaintiff's claim that the motion can be granted. *Lambert v. Smith, supra* [54 Wn.2d 348, 340 P.2d 774]; *Williams v. Hofer, supra* [30 Wn.2d 253, 191 P.2d 306]; *Music v. United Ins. Co.*, 59 Wn.2d 765, 370 P.2d 603.

The *Miller* case involved a shopper who fell while in the respondent's store, allegedly because the surface coating applied to the floor had made it slippery. The trial court had sustained a challenge to the plaintiff's evidence. In reversing the trial court, we stated the problem as follows:

Our problem here is to ascertain whether the general rule, as expressed in *Pement* [53 Wn.2d 768, 337 P.2d 30] and *Kalinowski* [17 Wn.2d 380, 135 P.2d 852] and a host of other cases therein cited, took the case from the jury. Our inquiry is directed to find an answer to this question: Did the appellant submit evidence from which a jury could reasonably infer that the surface coating on the floor had been either negligently applied or that the floor was smooth to a degree rendering it dangerous to business invitees?

Recourse to the testimony itself gives us the best answer.

We must, therefore, examine appellant's evidence in this case in order to determine whether, admitting its truth and drawing all favorable inferences arising therefrom, it was sufficient so that a jury could reasonably find that respondents were negligent in permitting the floor of the store to become covered with an unusual amount of a foreign substance, to wit, dirt, sand, and water which was brought in by other shoppers on a very rainy day.

The testimony of appellant and her three witnesses was in substance as stated below.

Appellant testified that she was wearing a pair of nurse's shoes with low heels when she was shopping in respondents' store. Her 14-year old daughter was with her. They entered the store in the late afternoon on December 22, 1962. After going to other parts of the store, they went to the blouse department, which is between the escalator and the main entrance to the store. After looking at blouses on the racks for 5 or 10 minutes, they decided to leave and go to another store (which is north of Rhodes) to shop.

Appellant's testimony as to her actions at the time she fell was as follows:

A. And as we started to walk away from the blouse racks, we walked a few feet and I noticed it was raining quite hard, so I thought, "Well, I think I'll go through the men's department, and look at a sweater, at some sweaters." I thought maybe I could possibly pick one up as a last-minute gift for my oldest son. Q. Which way is the men's department? A. The men's department is north. Q. Did you notice anything unusual about the

floor that particular day, at or near the blouse department? A. I noticed there was quite a bit of water there, uh, you know, puddles of water, people walking in and tracking in water, and mud, off their shoes. I noticed it was pretty wet. I was trying to be careful. Ordinarily, you just don't step in a puddle of water just like you would walk on the dry floor. Q. Could you tell us the condition of the floor, as opposed to just puddles, what was on the floor? A. It looked just muddy-like, just like, like, dirt off people's shoes, you know how. Well, if the women on the jury—I know women know when they scrub a floor, if somebody steps in it, it leaves marks. This was awful kind of muddy-like. Muddy marks. It was all kind of dirty water. Q. Did you see this before you fell? A. Yes. Q. And did it look like it had been mopped? A. No. Q. In the ten minutes you were around there, did you see anyone mopping the floor? A. No, I did not. Q. You did not? Did the condition increase or decrease while you were there, as far as the condition of the floor? A. Well, that, I don't remember noticing that. Q. Did any of the clerks tell you to look out for the condition of the floor? A. No. Q. Did you see any mop around? A. No. Q. Did you see any towels around? A. No. Q. Were there people walking in and out of this area? A. Yes, there were quite a few people because it was late Friday afternoon, and a lot of last-minute shoppers. Q. Now, Mrs. Messina, could you relate to us what you did when you decided to go back through the men's store? A. What do you mean? Q. How far did you get near the front entrance, or near the foyer? A. Well, I didn't get too far from the blouse rack, because you could see from where the blouses where I was standing, I could see it was raining outside, I could see people coming in, I could see they were all wet. It was raining quite hard, and I didn't get as far as the entrance. You could see through the glass doors that it was raining real hard. Q. Now, did you walk towards the entrance? A. I took a few feet towards the entrance, yes. Q. You mean a few steps? A. Excuse me. Q. Okay. Then what did you do? A. Then I thought, well, I'll go over into the men's department and then go out that door. As long as I was going to the men's department, I thought I'd look at the sweaters. As I turned, the next thing I knew my feet went out from under me and I fell. Q. Let's stop right there. Did you trip over your own feet? A. Oh, no. Q. Could you tell us what happened then? A. Well, I

just kind of just turned, naturally, and the floor was so wet, and it was slippery. I could feel that I was going to fall just the second I did, because the floor was slippery, and I just—my—feet—well, my right foot first, went right down. Q. Did that go down, or out from under you? A. Well, it went from under me. Q. What were your reactions, if any? A. The first thing I thought of was trying to get hold of something, and the blouse rack happened to be close by. I grabbed hold of the crossbar. In the picture, it doesn't show a crossbar in that particular picture, but there was a crossbar I managed to get hold of. I thought it would break my fall, but I couldn't stop myself from falling, and I just fell. Q. Did your body twist? A. Yes, I just wrenched my whole body when I grabbed the crossbar.

On cross-examination, she stated:

Q. Now, as I understand your testimony, Mrs. Messina, you turned away from the blouse bar and walked toward the entrance, and that you saw the condition of the floor, and you were trying to be careful at that point? A. Well, I wasn't paying attention to the floor at that time, as much as I was concerned about the rain outside. Q. And you turned around and took a few steps back, and fell? A. A few steps forward. Q. I mean, a few steps after you turned around back toward the other entrance? A. Yes, yes.

Appellant called as a witness one of respondents' maintenance employees and interrogated him regarding the care of the floors in the store. He testified that he (and apparently one other maintenance employee) put down rubber mats about 8 feet long and 3 feet wide at all four store entrances during the rainy season. These extended about 6 feet into the interior of the store. He said: "We check the floors for anything wrong." He further stated that they always check the entrances when it has been raining and mop it up if there is any water. That was one of the witness' duties. There was another employee who was also assigned to this work. When it is raining hard, he testified that they would watch it closely—maybe every hour. They used regular janitor's mops to mop up the floor because it gets a little wet and probably a little slippery. The

composition of the floor is like asphalt tile. The witness denied any personal knowledge as to whether the floors had ever been waxed and said that he was mistaken when he testified to the contrary in his deposition.

A lady who had been a friend of appellant's for 30 years happened to be in the blouse department at the time of the accident. She was unaware of appellant's presence until she "heard kind of a thump" and saw appellant on the floor. In her testimony, she described the condition of the floor as follows:

Q. Do you recall the condition of the floor there, in the vicinity where she fell? A. Yes. It was very wet. In fact, it was kinda like a puddle, and when a lot of feet walk on there, there's black marks from your shoes left there. Q. Could you see the black marks? A. Yes. Q. What did it seem to be made up of? A. Water, and, I imagine, the dirt from people's shoes is what made it black. . . . Q. Did the floor in the vicinity of the blouse rack look like it had been recently mopped? A. No. Q. How much foreign substance was there? A. Well, there was quite a bit, because it was a very wet day, and, and with the last-minute shoppers, there was quite a few, there was quite a bit of water on the floor, and black marks, black. Q. What was the condition in regards to—did you try the floor? A. Well, I was walking on it a few—I, I—I know when I went in, I almost slipped, when I went into the store, because the bottom of my feet were wet, but I didn't try anything when she was there.

On cross-examination, the witness testified that there was no mat on the floor near where appellant fell. She was shown a written statement signed by her and prepared by an insurance investigator which contained contrary statements. She denied making any statement to the investigator to the effect that there was a rubber mat inside the entrance where appellant fell.

Appellant's daughter (who was 16 at the time of the trial) testified that she was with her mother in Rhodes department store at the time of the accident. She had no recollection of seeing a mat on the floor. Concerning the condition of the floor and the circumstances of her mother's fall, the daughter said:

A. I don't remember; I think she was right next to me. She was probably ahead, a little ahead of me. Q. Do you recall seeing the mat shown there, defendant's A? A. I don't remember then, but I know it's there now. Q. All right, can you describe what the floor condition was in that vicinity. A. Well, it was all muddy. It was water mixed with dirt. Q. After you saw it was raining, what did you do then? A. My mother said she wanted to go to the men's department. Q. Then what happened? A. As soon as we turned around, we walked a little ways, and she fell. Q. I see. Did you see her fall? A. Yes, I did. Q. Could you describe to the court and the jury how she fell? A. She fell backwards, tried to grab the rack and went over on her right side. Q. Do you recall which arm she tried to grab the rack with? A. I think it was the right arm.

It is to be noted that, unlike the *Miller* case and the decisions referred to therein,[1] there is no evidence as to whether respondents had applied any wax or other surface coating to the floors in the store. The sole act of negligence alleged by appellant was permitting the floors to be covered with an unusual amount of dirt, sand, and water, thereby making the surface of the floor in the vicinity of the blouse bar (which was located near one of the store entrances) highly slippery. The evidence shows that the source of the dirt, sand, and water was from the shoes of customers who were entering the store in large numbers on a very rainy day. Thus, the alleged act of negligence was one of omission to perform a duty owed to business invitees as contrasted with an act of commission.

A leading case in this court concerning the liability of a storekeeper to a business invitee who slipped on a wet concrete floor is *Shumaker v. Charada Inv. Co.*, 183 Wash. 521, 49 P.2d 44 (1935). It is discussed in both briefs and should be given careful consideration.

In that case, the plaintiff (a woman) was walking along an aisle in a public market when she slipped and fell on the cement floor. The negligence alleged was that the owner

---

[1] *Pement v. F. W. Woolworth Co.*, 53 Wn.2d 768, 337 P.2d 30 (1959); *Kalinowski v. Y.W.C.A.*, 17 Wn.2d 380, 135 P.2d 852 (1943).

and operator of the market had permitted the floor to become and remain wet and slippery, and that this was the proximate cause of her fall. The defendant challenged the sufficiency of the evidence both before and after a verdict in the plaintiff's favor and appealed from the judgment entered on the verdict.

The evidence showed that the defendant rented space in the market to various merchants to display and sell green vegetables and similar produce to the public. These merchants sprinkled water over their wares at frequent intervals and also washed vegetables in open tubs or buckets with the result that the floor of the aisles became damp or even wet, and at times water was thrown on the floor. The defendant employed a manager and two janitors (one of whom was always on duty during business hours) whose duty it was to maintain the floors in good condition, sprinkling sawdust over the wet spots and keeping it swept up. While walking in an aisle near a vegetable stand, the plaintiff suddenly slipped and fell to the floor. Her shoes left a mark on the floor indicating where her foot had slipped.

Upon the appeal, the majority of this court, in a 5 to 4 decision, reversed the judgment with directions to dismiss the action, saying:

We are of the opinion that no primary negligence was, in this case, proven against appellant. Assuming that appellant knew that water was frequently splashed upon the cement floors of the market, and that these floors were often damp or even wet, it cannot be held that a wet cement floor constitutes such a dangerous condition as to hold the owner maintaining the same responsible as for negligence to one who slips thereon. A wet cement surface does not create a condition dangerous to pedestrians. It is a most common condition, and one readily noticed by the most casual glance.

The dissenting opinion was based on the fact that there was evidence from which the jury could have found—not merely that the floor was wet when the plaintiff fell—but that there was "a pool of water" (due to the uneven surface

of the concrete floor) into which the plaintiff stepped when she fell.

We think that in the present case appellant's evidence (most of which is quoted above), when accepted as true with all favorable inferences to be drawn therefrom, was sufficient to be submitted to the jury to determine the issue of respondents' primary negligence.

The many decisions of courts of last resort in this country dealing with our present problem are reviewed in the lengthy (150 page) annotation found in 62 A.L.R.2d 6. The various cases cited by the parties in their briefs are discussed in that annotation and need not be referred to individually in this opinion.

■ The rule applicable to this case is stated in the majority opinion in the *Shumaker* case as follows:

> It is undoubtedly the law that one who operates a store or place for the general sale of merchandise invites the public to frequent his place of business, and that he owes to his patrons the duty to maintain his establishment in a reasonably safe condition. What is a reasonably safe condition, of course, depends upon the nature of the business conducted and the circumstances surrounding the particular situation. (p. 524)

Our reasons for holding that appellant's evidence was sufficient to make out a prima facie case of liability against respondents under the rule above quoted are:

Appellant, who was shopping in respondents' store (a business invitee) was injured when she slipped and fell because of water and mud on the floor which had been tracked in by other patrons. In an endeavor to show that the storekeeper had failed to maintain his storeroom in such a condition as a reasonably careful and prudent store-keeper would deem sufficient to protect customers from danger, appellant called as an adverse witness a maintenance man employed by respondents.

As shown by the portion of this witness' testimony quoted above, he was rather indefinite as to precisely how often he or the other maintenance employee checked the floor area for water on rainy days and mopped it up if necessary.

He had no knowledge as to the events of December 22, 1962, when appellant slipped on the floor.

As stated above, drawing (as we must) the inferences most favorable to appellant from all the evidence presented by her, we think that it was sufficient to warrant submitting to the jury for its determination the ultimate issue as to whether respondents maintained their store in such a condition as a reasonably careful and prudent storekeeper would deem sufficient to protect customers from danger while exercising ordinary care for their own safety.

In addition to holding that appellant had failed to make out a prima facie case of primary negligence on the part of respondents, the trial court also ruled that appellant was guilty of contributory negligence as a matter of law.

The record does not contain any oral or written opinion of the trial court which would give us the benefit of the court's reasons for so holding on either of these issues.

Regarding the latter issue, respondents, in their brief, quote from appellant's testimony as follows:

"I noticed there was quite a bit of water there, uh, you know puddles of water, people walking in and tracking in water, and mud, off their shoes. I noticed it was pretty wet. I was trying to be careful. *Ordinarily, you just don't step in a puddle of water just like you would walk on the dry floor.*" (Italics supplied by respondents.)

They argue that her testimony shows that she was looking out the window to observe the weather conditions outside, and that, after creating her own standard of care, she turned "naturally" or in a normal fashion, thereby violating her own standard of care.

We do not think that this problem of contributory negligence can be disposed of as simply as respondents contend. It appears to us to be a question for the jury to decide whether appellant was contributorially negligent when she turned "naturally."

We are of the opinion that reasonable minds could differ as to both of the two issues presented by the present case.

Therefore, the judgment of dismissal is reversed, and the case is remanded for a new trial. Costs on this appeal

shall abide the event as provided in Rule on Appeal 55(b)(1). RCW vol. 0.

ROSELLINI, C. J., WEAVER and HAMILTON, JJ., and BARNETT, J. Pro Tem., concur.