[No. 38071. Department Two. October 13, 1966.]

JAMES J. CARRIERI, *Appellant*, v. ARNOLD J. BUSH *et al.*,
*Respondents.**

*Reported in 419 P.2d 132.

*Stephen S. Bassett* and *Bassett, Donaldson & Hafer*, for appellant.

*Burns & Schneiderman* and *Barry Alan Schneiderman*, for respondents.

HAMILTON, J.—Appellant husband, James J. Carrieri, brought this action for alienation of affections against respondents Arnold J. Bush, Ralph E. Derkland, Michael Panteleeff, Norman Baxter and their wives. Trial was commenced before a jury. At the conclusion of appellant's case, the trial court granted respondents' challenge to the sufficiency of the evidence. This appeal followed.

We reverse and remand the alienation of affections claim for trial.

■ In evaluating the evidence adduced by appellant, it is axiomatic that

"A challenge to the sufficiency of the evidence, or a motion for nonsuit, admits the truth of the plaintiff's evidence and all inferences which reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the defendant, and in the light most favorable to plaintiff. In the determination of such challenge or motion, even though the plaintiff's evidence is in some respects unfavorable to him, he is not bound by the unfavorable portion of such evidence, but is entitled to have his case submitted to the jury on the basis of the evidence which is most favorable to his contention." *Venezelos v. Department of Labor & Indus.*, 67 Wn.2d 71, 72, 406 P.2d 603 (1965).

■ Furthermore, in a case tried before a jury, no element of discretion is involved in the consideration of a challenge to the sufficiency of the evidence or a motion for nonsuit at the conclusion of a party's evidence. Such a challenge or motion can be granted only when the court can say, as a matter of law, that there is no substantial evidence to support the nonmovant's claim. *Messina v. Rhodes Co.*, 67 Wn.2d 19, 406 P.2d 312 (1965); *Hall v. Puget Sound Bridge & Dry Dock Co.*, 66 Wn.2d 442, 403 P.2d 41 (1965).

Briefly, the salient features of appellant's evidence, as it stood at the time of the respondents' challenge, can be stated as follows:

Respondent Bush, at all times concerned, was the pastor and leader of an unidentified religious sect. Respondents Derkland, Panteleeff and Baxter were the elders, who, with the pastor, determined and approved the policy and conduct of the order.

Appellant and his wife, Inga, were married in April, 1953. Concerning this union, appellant testified:

> The first four years of my marriage was wonderful. I had the best wife a guy could have. . . . We got along very wonderful. We met in church and we both, we got along real well. I used to brag at work I had the best wife a guy could have. You couldn't have a better wife. I was very well pleased, and our children came along and we just got along wonderful. . . . She would tell me she couldn't wait until I got home from work because she loved me so much.

In the latter part of 1956 or the early part of 1957, appellant and his wife moved to an area where respondent Bush was starting a church. They decided to attend the new church. After a short while, appellant ceased his attendance because he "couldn't quite agree with his [Bush's] style of preaching." Mrs. Carrieri, however, continued to attend, gradually devoting more and more of her time to the activities of the church. This precipitated a change in the familial attitude, described by appellant as follows:

> [A]t first it wasn't too bad. I still got along with her even though she was gone long hours. But as the hours increased her attitude in the home changed. It was a complete change in her attitude toward me and the children. . . . [H]er attitude became cold toward me. She treated me as a boarder, like she no longer loved me, and she would come right out and tell me that. And she acted so cold in her manner and some of the things she did she treated me so cold, and she had no interest in me whatsoever toward the end.

Becoming concerned with developments, appellant ap-

proached Pastor Bush, and, according to appellant, the following conversation occurred:

> I said, "I don't understand what you are preaching. Your doctrine seems to be a little different. There is a change, I notice a change in my wife, not only in the hours she stays away from home but in her attitude." I said, "What gives? I am concerned about my wife. She is no longer like she used to be." And he said, oh, my wife was in good hands and I shouldn't worry about her. He said, "We'll take care of your wife," and "Don't worry about her. She's in good hands."

Following this event, appellant testified:

> [I]t began to get real bad. She was gone almost all the time. She would even go at nine-thirty or ten o'clock, to a service at night. At nine-thirty and ten o'clock she would leave at night and go up to Bush's house. She spent much time at Bush's house and Ralph Derkland's house and Pantelef's [sic] house, and a few times at Baxter's house. . . . Most of the time that she was away she was in their home. She would help in the home, help in washing walls down, and help in Bush's house and take care of his house along with spending time in several other homes.

Respondents transported Mrs. Carrieri to and from her activities with them. One evening, at about 11:30 p.m., when Pastor Bush brought Mrs. Carrieri and the children home from a day's activities, appellant confronted the pastor. In appellant's words, the following exchange took place:

> I said, "Arnold, you know you're causing a lot of dissension in my home by keeping my wife away all the time. I asked you not to come pick her up. I believe we should go to church together. And we got along fine before she was going with your group. And there is so much dissension I asked you not to pick my wife up, to help our family instead of hindering it. . . . Immediately his eyes got big and large and he said immediately, he said, "No. You're full of the devil." My wife and children were there. He said, "She does not have to listen to you. You're full of the devil." He said, "I've got the gift of discernment." And he said, "I know all your sins. I've got the gift of discernment." And he

repeated that I was full of the devil in front of my wife and children, and my wife was crying and my children was crying. . . . He said he would continue. He said, "Inga, we will continue to pick you up." He said, "Don't listen to him. I've told you many times before, don't listen to your husband."

Thereafter, the marital breach broadened and appellant enlisted the aid of the minister who performed his marriage ceremony in the hope of bringing about a reconciliation. As a result, Mrs. Carrieri determined that, for the sake of her family, she would terminate her association with the sect. She insisted, however, on advising Pastor Bush of her decision. Appellant and his wife then went to the pastor's home to accomplish this mission. After Mrs. Carrieri stated her intentions, the following occurred (according to appellant):

Arnold Bush immediately jumped out of his seat and he said, "Inga, you took that oath. How can you do that when you took an oath? Don't you know you will die? Don't you know many people have died that go back on their oath? You will never get nothing from God, and I told you before your husband is full of the devil, and I have told you many times your husband is full of the devil." And he said, "God came to separate husband from wife. Don't you know it says that in the Bible, that God came to separate husband from wife?" And I said immediately, "Where is that in the Bible?" He said, "It's there." I said, "No. It says, 'What therefore God hath joined together, let no man put asunder.' " He said, "The devil did that. God had nothing to do with that." He insisted I was full of the devil and my wife could not turn back and leave his group because she took an oath. . . . And he definitely said that my wife would go to hell with me, and that she would never go to any other church and have any peace in her heart, that if she would go with me she would die. He said, "There's a curse on Jim and there will be a curse on you."

The upshot of this interview was described by appellant as follows:

As we got out I said, "Well, you can see what kind of man he is." And to my amazement my wife, with glassy eyes, she was shaking and crying, and she said, "No, he's

right. I can't leave. I can't leave." That's what my wife said, and our home got all the worse after that. There was just no home left.

Against appellant's wishes, Mrs. Carrieri's participation in the group's activities continued and increased. She attended meetings where it was avowed by the leadership that there were several homes in the church that should be broken up, and that the sooner this took place the better the church would be, accompanied by statements that death would pursue those who did not adhere to the church discipline. On one occasion, Mrs. Carrieri moved out of the family home and respondents concealed her whereabouts for a period of time. On another occasion, appellant testified he overheard the Baxters advising Mrs. Carrieri to divorce him.

Appellant initiated this action for alienation of his wife's affections, and Mrs. Carrieri commenced divorce proceedings. In April, 1964, a divorce was granted, and thereafter appellant's alienation of affections action came to the conclusion heretofore indicated.

■ Alienation of affections has been characterized as an intentional tort. *Miller v. Gruenwald*, 65 Wn.2d 186, 396 P.2d 554 (1964); *Lankford v. Tombari*, 35 Wn.2d 412, 213 P.2d 627, 19 A.L.R.2d 462 (1950). Basically, to establish a prima facie cause of action for alienation of affections, a complaining spouse must show (1) an existing marriage relation; (2) a wrongful interference with the relationship by a third person; (3) a loss of affection or consortium; and (4) a causal connection between the third party's conduct and the loss. Restatement, Torts § 683 (1938) and comments; 27 Am. Jur. *Husband and Wife* § 523 (1940); 42 C.J.S. *Husband and Wife* §§ 662-665, 669 (1944); Prosser, Torts § 118 (3d ed. 1964); 1 Harper & James, Torts § 8.3 (1956). See also, Annot. 19 A.L.R.2d 471 (1950).

■ Although the tort may be designated as intentional in nature, the alleged tort-feasor's intent or purpose does not have to be established by evidence independent of his conduct. This is so because conduct may infer intent, for, in the eyes of the law, a person intends the natural and

probable consequences of his voluntary acts. *Miller v. Gruenwald, supra; Boyle v. Clark,* 47 Wn.2d 418, 287 P.2d 1006 (1955); *Lankford v. Tombari, supra.*

To render the conduct wrongful, however, and thus satisfy the second element listed above, it must appear from the evidence that the alleged tort-feasor engaged in some kind of affirmative action, as opposed to inaction, the very design of which was to accomplish an alienation or diversion of the affections of the plaintiff's spouse. It is not necessary that the tort-feasor be motivated by spite or malice, or that adultery or improper relations accompany the alienating conduct. Conduct, without justification or excuse, coupled with a purpose or design to adversely affect the mental attitude of one spouse to the detriment of the other is the keystone of a wrongful interference with a marital relationship. *Lankford v. Tombari, supra; Allard v. LaPlain,* 147 Wash. 497, 266 Pac. 688 (1928); Restatement, Torts § 683 (1938); Prosser, Torts § 118 (3d ed. 1964); 1 Harper & James, Torts, § 8.3 (1956).

It is within the context of the defense of justification and excuse that a parent, near relative or one standing in a professional or semiprofessional relationship to a marital partner may be clothed with a qualified privilege to reasonably and in good faith intervene in the domestic affairs of a married couple. This privilege, however, where it appears, may be overcome by evidence that the interference in the marital affairs was prompted by malice or ill will; accompanied by falsehoods; implemented by threats; utilized recklessly; or motivated by an unlawful, immoral or improper purpose. *Stanley v. Stanley,* 27 Wash. 570, 68 Pac. 187 (1902); Restatement, Torts § 686 (1938); Prosser, Torts § 118 (3d ed. 1964); 1 Harper & James, Torts § 8.4 (1956). An intermeddling stranger, on the other hand, can claim no privilege to invade the domestic circle. He intervenes at his peril, and bears the burden of otherwise justifying or excusing his action. *Stanley v. Stanley, supra; Allard v. LaPlain, supra.*

The third element of the tort listed above—loss of affection or consortium—concerns itself principally with

the diminution, diversion, or alienation of the love, society, companionship, aid, and/or comfort of the alienated spouse. Absent a showing of adulterous conduct, this may ordinarily be demonstrated by substantial evidence of any statement, behavior, conduct, or attitude on the part of the alienated spouse from which a loss or impairment of conjugal attachment can reasonably be inferred. A defense showing of lack of conjugal affection at the time of the alleged alienation goes only to mitigation of damages. Such a showing does not constitute a bar to the action. *Morris v. Warwick,* 42 Wash. 480, 85 Pac. 42 (1906). Damages flowing from an alienation of conjugal affection are incapable of mathematical calculation and present a jury question. *Boyle v. Clark, supra.*

The fourth element—causal relationship between the third party's conduct and the loss of affection or consortium—is satisfied by the introduction of substantial evidence that the conduct of the asserted tort-feasor aided in causing the alienation. It is not necessary that it be the sole cause, but merely that it be a causal factor. *Swearingen v. Vik,* 51 Wn.2d 843, 322 P.2d 876 (1958); *Lankford v. Tombari, supra;* Annot. 19 A.L.R.2d 471, 500 (1950).

Finally, the law recognizes the right of discordant spouses to become reconciled, and one who interferes with that right can be subjected to liability in a suit for alienation of affections. *Miller v. Gruenwald, supra; Swearingen v. Vik, supra; Morris v. Warwick, supra.*

Accepting appellant's evidence in the favorable light required, and casting it against the backdrop of the foregoing concepts, we are satisfied appellant presented a prima facie case against respondents.

Respondents, however, impliedly urge, and the trial court in effect conferred upon them, an absolute privilege to interfere in appellant's marriage upon religious grounds.

There is no question that our state constitution protects the free exercise of religious beliefs (Const. art. 1, § 11 (amendment 34)), and neither a religious belief nor the lack of such belief is, of itself, grounds for divorce. *Donaldson v. Donaldson,* 38 Wn.2d 748, 231 P.2d 607, 25

A.L.R.2d 919 (1951). But, one does not, under the guise of exercising religious beliefs, acquire a license to wrongfully interfere with familial relationships. Good faith and reasonable conduct are the necessary touchstones to any qualified privilege that may arise from any invited and religiously directed family counseling, assistance, or advice. Ill will, intimidation, threats, or reckless recommendations of family separation directed toward alienating the spouses, where found to exist, nullify the privilege and project liability. *Hughes v. Holman*, 110 Ore. 415, 223 Pac. 730, 31 A.L.R. 1108 (1924); *Mohn v. Tingley*, 191 Cal. 470, 217 Pac. 733 (1923); Restatement, Torts § 686 (1938).

Thus, where, as here, appellant's evidence, if accepted as true, demonstrates a course of conduct designed to—and which does—alienate the affections of the opposite spouse, a prima facie case of alienation of affections is made out, notwithstanding the acts complained of may have been committed in the guise of religious teachings. *Hughes v. Holman, supra.*

The trial court's order dismissing appellant's case at the conclusion of his evidence is accordingly reversed.

ROSELLINI, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.

---

December 8, 1966. Petition for rehearing denied.