## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢

### RATCLIFFE AND OTHERS V. WALKER.

#### June 10, 1915.

1. HUSBAND AND WIFE—*Alienation of Affections—Liability of Parents, Brothers and Sisters—Malice.*—Parents may advise their children about their domestic affairs, without incurring liability, if the advice be given in good faith and prompted by worthy motives, even though such advice results in a separation and estrangement of husband and wife. Bad and improper motives will not be presumed as against parents, but must be clearly proved. The burden in such cases is upon the plaintiff to show that the parent has been prompted by malice; the presumption being that what the parent has said and done has been due to natural affection and to regard for the best interests of the child. When, however, it is made to appear by clear and satisfactory evidence that the parent has been actuated by malice, and has wilfully interfered on that account, and not on account of the welfare of the child, to bring about a separation, an action for damages will lie. The same principles apply in actions against the mother, brothers and sisters as against the father.

2. HUSBAND AND WIFE—*Alienation—Ill Will of Parents.*—In an action by a husband against the parents, brothers and sisters of his wife for alienating her affections from him, the mere fact that the defendants manifested ill will towards the plaintiff would not be sufficient to overcome the legal presumption in their favor; but the jury should consider all the facts and circumstances of the case, including the ill will, in determining whether or not the defendants were actuated by malice. In the case at bar, there were sufficient facts and circumstances to justify the court in submitting the question to the jury, and to justify the jury in finding against the defendants.

3. TORTS—*Joint Liability—Degree of Participation.*—Although more activity may have been displayed by some of the defendants than others in bringing about the injury complained of, everyone who encourages a wrong or incites the same by words, gestures, looks or signs, or who by any means countenances

72

or approves the same, is in law deemed to be an aider and abetter, and liable as principal.

4. INSTRUCTIONS—*Refusal to Amend—Fully Instructed.*—The judgment of the trial court will not be reversed for its refusal to amend an instruction where it appears that the jury were fully and carefully instructed on the point covered by the proposed amendment and no prejudice could have resulted from its refusal.

5. INSTRUCTIONS—*Partial View of Case.*—An instruction which takes only a partial and incomplete view of the evidence adduced and upon that directs a verdict is properly refused.

6. TORTS—*Joint and Several Liability—Conspiracy.*—For a tort by several there may be a judgment against all or any one or any intermediate number of those sued, hence where several are sued for a joint tort by conspiracy it would be error to charge that there could be no recovery against any unless a conspiracy by all were proved. Moreover, difficulties of misjoinder and variance are fully met by sections 3258-a and 3384 of the Code (1904).

7. INSTRUCTIONS—*Correction of Errors in Instructions Tendered.*— Where other correct instructions have been given which are free from ambiguity, there is no duty upon the trial court to modify an incorrect instruction and give it, nor to give a new one in its place.

Error to a judgment of the Law and Equity Court of the city of Richmond in an action of trespass on the case. Judgment for the plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Meredith & Cocke* and *J. McD. Wellford,* for the plaintiffs in error.

*L. O. Wendenberg* and *T. Gray Haddon,* for the defendant in error.

KELLY, J., delivered the opinion of the court.

This is an action of trespass on the case brought by Thomas Grant Walker against H. L. Ratcliffe and Alice, his

wife, and their children, Frank, John and Alice Ratcliffe. The declaration charges the formation and execution of a conspiracy to alienate from the plaintiff the affections of his wife, who was a daughter of H. L. and Alice Ratcliffe, and a sister of the other defendants. To a judgment for the plaintiff in the sum of $5,000 this writ of error was awarded.

The evidence is voluminous and on some points conflicting, but viewing it as on a demurrer, the following facts appear: The plaintiff at the time of his marriage was thirty-two years old and resided in Richmond. His wife was twenty-two, lived with her parents near Richmond (paying for her board), and was employed in the city as a stenographer. They had known each other for several years and had been engaged for about eight months. The plaintiff had for a long time been a frequent and apparently welcome visitor at her home, going there several times each week and nearly always taking supper there on Sunday night. He had accumulated a small estate and was a man of good character. The defendants disclaim all knowledge of the engagement but do not suggest any valid objection, and say that their only grievance was that they were not informed of the contemplated marriage. The ceremony took place on the morning of April 25, 1913, at the home of the officiating minister in Richmond, in the presence of the minister's wife and of a sister and brother-in-law of the plaintiff. The bride and groom both seemed to believe that the wedding would be opposed if their plans were known at her home, but the record discloses no just ground upon which to charge him with having persuaded her against her will into a clandestine marriage. Every detail, in so far as not suggested by her, was arranged with her free and full approval. The plaintiff's sister advised her to tell her mother, but she thought it best not to do so. As soon as the ceremony was over she tele-

phoned the news to her mother, and the latter was greatly affected and at once became hysterical. The bride's father then came to the telephone and told her that she had about killed her mother and ordered her never to put her foot in the home again. Both the father and the mother were very angry and shortly afterwards used some very violent and threatening language with reference to the plaintiff, which need not in terms be repeated here.

After spending some hours in the city and having lunch at the Richmond Hotel with some of his relatives, the plaintiff and his wife started on the wedding trip which they had previously planned, taking an afternoon train for Washington. While on that train they received a telegram, addressed to Mrs. T. G. Walker and sent by John Ratcliffe, in these words: "Your mother is dying. I would advise you to return to my house." This telegram was sent at the suggestion of the sister, Alice Ratcliffe, made to John Ratcliffe over the telephone some hours after he had seen his mother and had left her to return to his business. About an hour later, Frank Ratcliffe, who had just returned from a long trip, tried to reach Mrs. Walker with a telegram, which was never delivered but which read as follows: "Come home to-night, if possible. Mamma, I think, is dying. Everything will be all right." At the time he sent this telegram his mother was sitting in a rocking chair on the porch. He says, "She looked very peculiar, slightly hysterical, and I might say she was deranged, from her appearance." He sent the telegram after his sister Alice had suggested that he "try to get Bettie," meaning plaintiff's wife.

Under the influence of the telegram from John Ratcliffe, the plaintiff and his wife left the train at a station called Doswell, and obtained by telephone some information from an aunt and from another brother of the plaintiff's wife, which indicated that the telegram was a fabrication, but

they decided, largely upon his judgment and recommendation, that it would be best to return and investigate the situation. Upon their arrival in Richmond they went to his family home. While at supper there Mrs. Walker was called to the telephone to talk to her brother, Frank Ratcliffe, and their conversation resulted in an arrangement by which he was to meet her at Seventh and Broad streets, in Richmond, and take her to her father's home that night. He would not agree for her husband, the plaintiff, to bring or even accompany her, claiming that "his presence or the very mention of his name would mean instant death" to her mother. Mrs. Walker wanted her husband to accompany her, and she waved and smiled at him as she left with her brother and took the street car for her home, promising to call him up the next morning. It is significant, and is pertinent in this connection, that up to this moment of separation there had been no indication that she regretted her marriage or had any thought of giving up her husband. She was distressed about the attitude of her parents, but after she knew of that, she willingly started on the wedding trip and would have continued the journey after the telegram was received if her husband had insisted upon that course. In fact, the more probable conclusion from the evidence is that but for his positive advice to the contrary, they would have gone on to Washington. On the train that afternoon and also after she had returned to Richmond that evening, she was making a list of the names of friends for whom she intended announcements of her marriage. It is beyond question that the courtship of this couple had been a long and happy one, and that they had been devoted to each other. Another fact worthy of consideration in connection with the circumstances surrounding this parting between them at Seventh and Broad streets is that John Ratcliffe was present on that occasion and claimed, in the presence of plaintiff and his friends, and in

rather conspicuous manner, that he was going to his own home in the city for the night, but instead went almost immediately to the home of his father in the country, arriving there about thirty minutes after Frank Ratcliffe and Mrs. Walker arrived.

Mrs. Walker found her mother in bed and, as she thought, in a sort of stupor. The record shows conclusively that her condition was not, in fact, and had not been at any time, alarming. It may have been made to appear otherwise to Mrs. Walker. There had been no reasonable ground at any time that day for saying that she was dying, and after Mrs. Walker arrived she, and not her mother, was the center of interest and attention on the part of the family. Her brother Frank told her, in substance, that night in the presence of her brother John, that she could see for herself what her mother's condition was; that she had caused it; that he would take her back that night or the next day, if she wanted to return to Walker, but that there was no middle ground and *she must choose between Walker and her family*. Before this interview was concluded her father came in the room and told her that if Walker came there that night he would shoot him. Her mother had stated during the day that if Walker came on the place she would "cut his heart and liver out," and had used other expressions indicating a high degree of temper and ill-will towards the plaintiff. Her father and her brothers Frank and John had told Dr. Redd during the day that they were going to try to keep the plaintiff and his wife apart, or words to that effect. Mrs. Walker decided that night to give up her husband, taking from her finger her engagement ring and wedding ring and turning them over to one of her brothers. It was agreed that her brother Frank should take her out of the State to some place which was not fixed upon that night. Later on in the night, in compliance with a suggestion which they say came from Mrs.

Walker, John and Frank went to the home of an attorney, who had been theretofore acting as counsel for John Ratcliffe, and arranged with him to come to the Ratcliffe home the next day for a conference. This was the Friday night of the wedding day. The next day the plaintiff, who had requested to see his wife, was permitted to see her at John Ratcliffe's home, but was not allowed a private interview; both John and Frank Ratcliffe were there at the time, and while the plaintiff was left for a few moments with his wife in the parlor, one or the other of the brothers was in a position to hear everything that was said all the time. John had in his possession, and delivered to her there, her engagement ring and wedding ring, and she in turn delivered them to her husband and told him that she had made a mistake in marrying him, and wanted to be released. After Walker had left the house, John Ratcliffe commended Mrs. Walker's decision to go to Pittsburgh, advising her to go on there and "forget everything except that she had two friends" (meaning himself and Frank) who would supply her needs, adding, however, that if she should decide to come back to Walker, he had nothing to do with that. On the next day, which was Sunday, Frank took her to Pittsburg, where she lived under her maiden name in the family of an intimate friend of his until this suit was brought.

After she went to Pittsburg the plaintiff, having secured her address, wrote her several times and visited her once, earnestly appealing to her to come back to him, but without avail. The Ratcliffe family kept in close touch with her, and her mother and brother Frank visited her shortly after the plaintiff had been to Pittsburg to see her. Finally, the plaintiff, giving up all hope of reconciliation, instituted this suit.

The fundamental question here presented, as to the liability of the immediate family of the consort in a suit for

alienation, as distinguished from the liability of a stranger, is new in Virginia, but has frequently arisen in other jurisdictions. The general rule, consonant with reason and sustained by authority, is that parents may advise their children about their domestic affairs without incurring liability, if the advice be given in good faith and prompted by worthy motives, even though such advice results in a separation and estrangement of husband and wife. Bad and improper motives will not be presumed as against parents, but must be clearly proved. The burden in such cases is upon the plaintiff to show that the parent has been prompted by malice, the presumption being that what he has said and done has been due to natural affection and to a regard for the best interests of the child. When, however, it is made to appear by clear and satisfactory evidence, that the parent has been actuated by malice, and has wilfully interfered on that account, and not on account of the welfare of his child, to bring about a separation, an action will lie against him for damages. The law on this subject is so satisfactorily discussed and so many pertinent authorities are cited in the case of *Multer* v. *Knibbs,* 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322-325, 9 Ann. Cas. 958, that we deem it proper to quote somewhat at length from the opinion in that case:

"There is a material difference between the acts of a parent and those of a mere intermeddler. Even in the latter case, a defendant may disprove any intent on his part, in advising the wife, to cause a separation; and may show that his advice was honestly given. *Tasker* v. *Stanley,* 153 Mass. 148, 26 N. E. 417, 10 L. R. A. 468. But the rights and the corresponding duties of a parent are much greater than those of a stranger; and much stronger evidence is required to maintain an action against him. It is proper for him to give to his daughter such advice and to bring such motives of persuasion or inducement to bear

upon her as he fairly and honestly considers to be called for by her best interests; and he is not liable to her husband in damages for her desertion resulting therefrom, unless he has been actuated by malice or ill-will towards the plaintiff, and not by a proper parental regard for the welfare and happiness of his child. In such an action, the material question is the intent with which the parent acted, rather than the wisdom, or even the justice, of the course which he took. These questions have arisen in other jurisdictions; and, so far as we have been able to discover, they always have been answered in the same way. The leading case is *Hutcheson* v. *Peck,* 5 Johns [N. Y.] 196; and the doctrine there laid down has commanded assent. *Oakman* v. *Belden,* 94 Me. 280, 80 Am. St. Rep. 396, 47 Atl. 553; *Smith* v. *Lyke,* 13 Hun. [N. Y.] 204; *Holtz* v. *Dick,* 42 Ohio St. 23, 51 Am. Rep. 791; *Westlake* v. *Westlake,* 34 Ohio St. 621, 32 Am. Rep. 397; *Rice* v. *Rice,* 104 Mich. 371, 62 N. W. 833; *White* v. *Ross,* 47 Mich. 172, 10 N. W. 188; *Tucker* v. *Tucker,* 74 Miss. 92, 32 L. R. A. 623, 19 So. 955; *Payne* v. *Williams,* 4 Baxt. [Tenn.] 583; *Glass* v. *Bennett,* 89 Tenn. 478, 14 S. W. 1085; *Brown* v. *Brown,* 124 N. C. 19, 70 Am. St. Rep. 574, 32 S. E. 320; *Huling* v. *Huling,* 32 Ill. App. 519; *Reed* v. *Reed,* 6 Ind. App. 317, 51 Am. St. Rep. 310, 33. N. E. 638. * * * And the burden is upon the plaintiff to show that the defendant had been prompted by malice in what he has said and done, and to overcome the presumption that he acted under the influence of natural affection and for what he believed to be the real good of his child. *Bennett* v. *Smith,* 21 Barb. [N. Y.] 439; *Pollock* v. *Pollock,* 9 Misc. 82, 29 N. Y. Supp. 37; *White* v. *Ross, Westlake* v. *Westlake* and *Brown* v. *Brown, supra; Young* v. *Young,* 8 Wash. 81, 35 Pac. 592; *Reed* v. *Reed, supra.* But if there is evidence upon which the jury would have a right to find that the defendant has actively interfered to cause his daughter to

73

abandon her husband, and has deprived him of her affections and of the comfort and solace of her society, and 'has done this from malice to the plaintiff, and not for the purpose of affording proper protection to his child and furthering her true welfare, then the case must be left to the jury, with the instruction that, if these facts are proved, the action may be maintained. *Holtz* v. *Dick, supra; Price* v. *Price,* 91 Iowa, 693, 29 L. R. A. 150, 51 Am. Rep. 360, 60 N. W. 202; *Tucker* v. *Tucker* and *Bennett* v. *Smith, supra; Williams* v. *Williams,* 20 Colo. 51, 37 Pac. 614; *Railsback* v. *Railsback,* 12 Ind. App. 659, 40 N. E. 276, 1119. This was recognized by all the judges in *Hutcheson* v. *Peck,* 5 Johns [N. Y.] 196. The question accordingly is whether there was such evidence in this case."

The principles above announced have usually found expression in actions against the father, but they seem to apply as well to mother, brothers and sisters. *Powell* v. *Benthall,* 136 N. C. 145, 48 S. E. 598; *Miller* v. *Miller,* 154 Iowa 344, 134 N. W. 1058; note to *Geromini* v. *Brunelli,* 46 L. R. A. (N. S.) 465; *Glass* v. *Bennett, supra.*

There is no essential difference between counsel for plaintiff and defendants upon the substantive law of this case; their differences being found in the application of the law to the evidence, and in certain collateral questions arising in the course of the trial.

The first ground upon which we are asked to reverse the judgment is that the evidence was not sufficient to warrant a verdict against any of the defendants; and this ground is especially urged as to H. L. Ratcliffe and wife and their daughter Alice.

We do not think this contention can be sustained. The evidence is so voluminous as to preclude the possibility of bringing any detailed discussion or recital of it here within reasonable limits. We have considered it carefully and are of opinion that the direct testimony, together with

the fair inference from the circumstances and from the conduct of the parties, warranted the jury in finding a verdict against all of the defendants. It is strongly urged on behalf of H. L. Ratcliffe and wife that their threats against the plaintiff and their manifest ill-temper towards him should not be considered as evidence against them, because under the law their anger should be attributed not to malice but to their affection for their daughter, and to a concern for her best interests. The mere fact that these defendants manifested ill-will towards the plaintiff would not be sufficient to overcome the legal presumption in their favor, but we think the record disclosed sufficient facts and circumstances to justify the court in submitting the question to the jury, and to justify the jury in finding against the defendants. They themselves say that if their ccnsent had been sought they would have acquiesced and would have wished the young couple well, and they were unable to suggest a single satisfactory reason why the marriage should not have occurred.

More activity in bringing about the separation was displayed by some than by others of the defendants. All five of them, however, were in the home together when the separation was agreed upon. The evidence in its entirety, if it does not impel the conviction, is sufficient to sustain the jury's conclusion that there was a common understanding and a common design. Any person present at the doing of a wrong, "encouraging or inciting the same by words, gestures, looks or signs, or who by any means countenances or approves the same is in law deemed to be an aider and abettor, and liable as principal." *Dangerfield* v. *Thompson*, 33 Gratt. (74 Va.) 136, 151, 36 Am. Rep. 783.

In concluding this branch of the case we quote with approval the following language from the opinion of the judge who presided at the trial:

"The two main questions of fact to be decided by the jury in this case were whether a conspiracy existed among the defendants, and whether they maliciously sought to deprive the plaintiff of the society of his wife. Such issues are especially for the determination of a jury, as their decision so largely turns upon inferences from the evidence as to motives and intent, which are as a rule not capable of direct proof. The evidence in cases involving conspiracy, malice and fraud is apt to be circumstantial only. As said by Mr. Greenleaf (Evidence, vol. 3, sec. 93) : 'The evidence in proof of a conspiracy will generally, from the nature of the case, be circumstantial. Though the common design is the essence of the charge, it is not necessary to prove that the defendants came together and actually agreed in terms to have that design, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object.'

"Upon a careful consideration of all the evidence in the case, viewed in the light of these established principles of law, I am unable to hold that the verdict of the jury was so plainly against the evidence, or so palpably without evidence that it is the duty of the court to set it aside. The case involved the scanning of various phases of human conduct under the circumstances in which the parties were placed, with inferences to be drawn as to the intent and motives by which they were actuated. Conclusions upon such matters are peculiarly for the judgment of a jury, and while the direct testimony is not very convincing, and not equally strong against all of the defendants, yet the voluminous evidence discloses sufficient facts, in a case

of this character, to render the conclusion of the jury final, so that the court is without power to disturb it."

We pass now to a consideration of the alleged errors in the instructions to the jury.

Complaint is made that the court refused to amend one of its instructions so as to tell the jury that they must be guided by reasonable and natural inferences only and not by mere conjecture and suspicion. The instructions, taken as a whole, emphasize and reiterate the legal presumptions in favor of the defendants, the burden of proof on the plaintiff and the character and clearness of the evidence necessary to sustain that burden, and we are satisfied that the defendants could not have been prejudiced by the refusal of the court to make the amendment in question.

The defendants asked the court, in what they designate as prayer No. 3½, to tell the jury "that there was no proof" (1) that the defendants, or any of them, gave any advice to the wife to induce a separation, (2) indulged in any solicitation or used any compulsion to that end, (3) made any threats to that end, (4) entertained any malice towards the plaintiff. Under our view of the law and the evidence, this prayer was properly denied. The instruction requested would have improperly withdrawn from the jury a state of facts and circumstances peculiarly within its province.

Defendants' prayer No. 13 was also properly refused. The instruction requested was as follows: "The jury are instructed that if they believe from the evidence that there was not exercised by any one or more of the defendants either compulsion or solicitation to cause or persuade plaintiff's wife to separate and remain away from him and that all that was said by any one of the defendants as to such separation was the statement of Frank Ratcliffe that she saw the condition in which her mother was, that if she desired it he would take her to her husband that night or

the next day as she might prefer, but that there could be no middle course and that she must understand that she must choose between her own family and her husband and that she thereupon asked the said Ratcliffe whether, if she should decide to stay with her family, he would protect her, to which he replied that he would give her all the protection in his power and that thereupon she asked him if he would take her away, to which he replied that he would if she desired to go, then the jury must find for the defendant."

This instruction singled out one statement of the defendant, Frank Ratcliffe, in a context which might have led the jury to infer that the court did not regard the statement as of serious import, and tended to withdraw that statement from consideration by the jury in the light of the temper and attitude which all of the defendants had assumed towards the plaintiff's marriage at the time the statement was made. It ignored John Ratcliffe's encouragement to her to go on to Pittsburgh, and disregarded a number of other facts and circumstances proper for the jury to consider in determining the purpose and probable effect of the statement recited in the instruction, and directed a verdict for the defendants upon a partial and incomplete view of the evidence. Instructions of this character have repeatedly been condemned by this court. See *Vaughan M. Co.* v. *Staunton Tea Co.*, 106 Va. 452, 56 S. E. 140; *Southern Ry. Co.* v. *Baptist*, 114 Va. 723, 77 S. E. 477.

Instruction No. 4, requested by defendants, was properly refused. It would have told the jury that unless the plaintiff proved a conspiracy by all of the defendants there could be no recovery. The argument used for this instruction is based on the claim that the plaintiff was bound to prove the conspiracy as alleged. If by this it is meant that in an action like this there must be a recovery against all or none of the defendants, the contention is plainly un-

tenable. The damage to the plaintiff, and not the conspiracy, was the gist of the action, and the court in other instructions properly told the jury in effect that they might find a verdict against two or more of the defendants, if the charge of conspiracy was sustained, and as to any one or more for individual responsibility if no conspiracy was proved. 5 R. C. L., sec. 56, page 1106; *Porter* v. *Mack* 50 W. Va., 581, 40 S. E. 459; 1 Cooley on Torts (3rd ed.), 210-214; 4 Encl. Pl. & Pr., 738-739. Independently of these authorities, any real difficulties that could arise in a case like this from a misjoinder of defendants or a variance between the allegations and the proof are fully met by sections 3258-a and 3384 of the Code.

In so far as the argument for instruction No. 4 relates to the proof of the methods by which the alleged conspiracy was carried out, conceding it to have been right in this respect, it is sufficient to say that the error already pointed out eliminates the instruction from further consideration. The other instructions, as given, were correct and free from ambiguity, and there was no duty upon the court to modify and give this one or to give a new one in its place. *C. & O. Ry. Co.* v. *Stock*, 104 Va. 97, 110, 51 S. E. 161.

With respect to the remaining exceptions to the action of the court in giving or refusing instructions, we deem it sufficient to say that no new or novel questions are presented therein, and that the instructions in the aggregate seem to us to have fairly and fully submitted the law of the case to the jury. It is not too much to say that the instructions, considering the number asked for and the number actually given, were remarkably accurate and clear as a whole.

The judgment complained of is affirmed.

*Affirmed.*