733 P.2d 693

Jerry Bryant O'NEIL, and Jerry Bryant O'Neil, Guardian Ad Litem for David A. O'Neil, Wendy K. O'Neil, Laura B. O'Neil, Sara L. O'Neil, and Maria J. O'Neil, Plaintiffs-Appellants,

v.

Francis K. SCHUCKARDT a/k/a Bishop Francis of Fatima Crusade, Frater R. Denis Chicoine, Sister Mary Bernadette Janet Urban, Alvina Urban, and Christ the King Priory, Inc., an Idaho Corporation, Defendants-Respondents.

No. 15580.

Supreme Court of Idaho.

Dec. 12, 1986.

Rehearing Denied March 12, 1987.

M. Dean Jellison, Kalispell, Mont. (argued), and Charles Sheroke, Coeur d'Alene, for plaintiffs-appellants.

Bliss O. Bignall, Jr., Coeur d'Alene, for defendants-respondents.

1986 Opinion No. 101, Issued July 3, 1986, is hereby withdrawn, and this opinion is substituted therefor.

## ON REHEARING

HUNTLEY, Justice.

Jerry O'Neil appeals from an order granting defendants' motion for judgment notwithstanding the verdict after a jury rendered a one million dollar verdict in favor of him and his children. O'Neil had brought suit against Francis K. Schuckardt, Bishop of the Fatima Crusade, against the Fatima Crusade Church itself, and against various members of the church for alienation of his wife's affections and for invasion of his, his wife's and his childrens' privacy.

Jerry O'Neil and Pauline Urban O'Neil were married in 1965. Over the next eight years they had five children. Pauline was raised in a Catholic family where religion

occupied a very important part of the family's life. Jerry was not Catholic, took no lessons or training in the Catholic faith before marrying Pauline, and had made no commitments or promises about having his children raised as Catholics.

Pauline's mother, Alvina Urban, became actively involved with the Tridentine Latin Rite Church, also known as the Fatima Crusade, a fundamentalist sect of the Catholic Church led by defendant Bishop Francis K. Schuckardt. Members of the church adhere to beliefs of the Catholic religion as taught prior to Vatican Council II, which concluded in 1967. They believe that marriages between Catholics and non-Catholics are not valid in the eyes of God unless the non-Catholic has taken instruction in the faith and has agreed that any children of the marriage be raised as Catholics. They do not believe the present Pope is the true head of the Catholic Church. Their views are otherwise very similar to those of the Roman Catholic Church. They contend that they represent the true Catholic Church. Pauline's sister Janet, known as Sister Mary Bernadette, is a nun in this church, and Pauline's mother, Alvina Urban, runs a boarding house for the church schools.

In early 1974, Pauline's mother called her, offering to come to Kalispell and bring Pauline and her children to Alvina's church boarding house in Coeur d'Alene, Idaho, headquarters of the church. Their subsequent visit to Coeur d'Alene was with Jerry O'Neil's consent.

Jerry testified that defendants, who also include Pauline's mother and sister, purposefully lied and misrepresented the church to Pauline, and required her to do things in the name of the faith which were intended to break up the marriage and alienate the children from their father. Jerry believes that other church members intentionally kept Pauline from meeting with him, mistreated his children while they were in the church school, and misled both him and Pauline about the status of their marriage.

Pauline, on the other hand, testified that she went to Coeur d'Alene because she wanted to join the church; that she was not seriously contemplating divorce at that time; that she was allowed out of the boarding house whenever she chose and permitted to meet with whomever she chose; that when Jerry went to visit her, she was terrified of him because he was unreasonable and violent.

The defendants believed, and instructed Pauline, that the marriage was not valid in the eyes of God because Jerry was not Catholic and had taken no instruction. They told Pauline that she could not live with Jerry as his wife since that would be committing a sin, but that she could live with him and her children as though Jerry were her brother. The O'Neils were divorced in the courts of Idaho, and Jerry O'Neil was awarded custody of the children. The divorce decree provided that Pauline O'Neil was restrained from imposing on her children her religious or philosophical beliefs in the Fatima Crusade and that neither Jerry nor Pauline were permitted to carry on any conduct that would create mental distress and disturbance on the part of the children.

In December 1975, Jerry O'Neil filed suit in his own name and as guardian ad litem for his five children, some of whom had moved in with their mother. The defendants included Bishop Francis Schuckardt; Frater Denis Chicoine, a priest in the Fatima Crusade; Sister Mary Bernadette Janet Urban, Pauline's sister; Alvina Urban, Pauline's mother; and Christ the King Priory, Inc., the corporate entity of the church. O'Neil alleged alienation of affections of his wife, invasion of privacy of both his wife and children, and alienation of affections of the children from their mother. After trial in August, 1983, the jury returned a unanimous special verdict in which it found that the defendants did alienate the affections of Pauline from Jerry, and that defendants invaded the marital privacy of the parties, and invaded the privacy of the children. The jury awarded to Jerry damages of $250,000 for the alienation of his wife's affections and for inva-

sion of their marital privacy, $50,000 to each child for invasion of their privacy, and $500,000 in punitive damages.

Defendants moved for judgment notwithstanding the verdict, and, alternately, for remittitur or new trial. The trial court ultimately granted the motion for judgment n.o.v., ruling that O'Neil had not met his burden of proving the elements of either alienation of affections or invasion of privacy. O'Neil appeals from the trial court's order, and additionally argues that he should have been awarded attorney fees, even though he represented himself.

For the reasons which follow, we affirm the granting of the judgment n.o.v. as to the cause of action concurring alienation of affections, reverse its granting as to the invasion of privacy causes of action, and remand for further proceedings.

## I. ALIENATION OF AFFECTIONS

Tort law protects relational interests as well as interests in property and in the person. P. Keeton, *Prosser and Keeton on the Law of Torts*, § 915 (5th ed. 1984). The action for alienation of affections evolved from an action protecting property interests to one protecting relational interests. It initially arose by analogy to the action a master had against one who enticed away his servant, in whose services the master held a quasi-proprietary interest. The early common law considered the wife a servant to her husband. His suit against one who enticed her away was for the loss of her services. W. Keeton at § 916. Eventually, courts also found a wife had a proprietary interest in her husband's services and could sue one who enticed away her husband. *Bennett v. Bennett*, 116 N.Y. 584, 23 N.E. 17, 21 (1899). This view of a wife's interest in her husband's services complimented the Married Women's Property Acts passed in the late 1800's, which gave to women the same rights to own property as those held by men. Note, *The suit of Alienation of Affections: Can its Existence be Justified Today?* [Hereinafter *Alienation of Affections*] 56 N.D.L.Rev. 239, 243 (1980). As

time went on, the focus of damages shifted from loss of services to the loss of the companionship and affections of the spouse. *Edgren v. Reissner*, 239 Or. 212, 396 P.2d 564, 567 (1964); Holbrook, *The Change in the Meaning of Consortium*, 22 Mich.L.Rev. 1 (1923).

The elements of an action for alienation of affections are: (1) an existing marital relationship; (2) an intent to alienate the spouse's affections by defendants' conduct; (3) an actual alienation of the spouse's affection; and (4) a causal connection between defendants' conduct and the alienation (proximate cause). With respect to the second element, actual, direct proof of an intent to alienate is not necessary. It is sufficient to prove the natural and probable consequence of the defendants' acts was to alienate the affections of the spouse. *Carrieri v. Bush*, 69 Wash.2d 536, 419 P.2d 132, 136 (1966).

Several defenses are available depending upon the status of the defendant. Parents are privileged to alienate the affections of their child's spouse in a good faith effort to protect their child's welfare. *Bradford v. Bradford*, 165 Or. 297, 107 P.2d 106, 109 (1940). The privilege terminates when a parent acts with ill will. *Poulos v. Poulos*, 351 Mass. 603, 222 N.E.2d 887, 890 (1967). It also terminates when a parent acts unreasonably under the circumstances. American Law Institute, *Restatement of Torts Second*, § 686, Comment F. Some jurisdictions extend the same privilege to siblings and other close relatives. *Falk v. Falk*, 279 Mass. 530, 181 N.E. 715 (1932); *Wohlfort v. Wohlfort*, 125 Kan. 234, 263 P. 1062 (1928); *Ratcliffe v. Walker*, 117 Va. 569, 85 S.E. 575 (1915).

The clergy can invoke religious motives as a defense to an action for alienation of affections. *Radecki v. Schuckardt*, 50 Ohio App.2d 92, 361 N.E.2d 543, 545 (1976). However, if a minister deliberately invades the marriage, he may be held liable, despite a religious purpose. *Bear v. Reformed Mennonite Church*, 462 Pa. 330,

341 A.2d 105, 107 (1975); *Carrieri v. Bush, supra,* 419 P.2d at 136–37 (Wash.1966).

█ The cause of action for alienation of affections has been abolished or narrowed to insignificance in most states, either by statute or by the courts.[1] Where challenged, the abolishing statutes have consistently been held constitutional. *Magierowski v. Buckley,* 39 N.J.Super. 534, 121 A.2d 749 (1956); *Chiyoko Ikuta v. Shunji K. Ikuta,* 97 Cal.App.2d 787, 218 P.2d 854 (1950); *Rotwein v. Gersten,* 160 Fla. 736, 36 So.2d 419 (1948); *"Anti-Heart Balm" Legislation Revisited see* 56 N.W.U.L.Rev. 538 (1961); *Hanfgarn v. Mark,* 274 N.Y. 22, 8 N.E.2d 47 (1937) second appeal 274 N.Y. 570, 10 N.E.2d 556 (1937), appeal dismissed, 302 U.S. 641, 58 S.Ct. 57, 82 L.Ed. 498. Judicial abolition of the cause of action is much more rare. Two states have abolished the action in the courts. *Fundermann v. Mickelson,* 304 N.W.2d 790 (Iowa 1981); *Wyman v. Wallace,* 94 Wash.2d 99, 615 P.2d 452 (1980).

England never had a cause of action for alienation of affections. Louisiana rejected the action from the start and has never recognized it. *Moulin v. Monteleone,* 165 La. 169, 115 S. 447 (1927).

In *Fundermann,* the Iowa Supreme Court abolished the cause of action noting it was based on both the anachronistic proposition that wives are their husband's property and the false premise that a spouse's sincerely held affections are vulnerable to the intervention of third parties. The court also doubted the ability of the action to preserve marriage. Indeed, the court felt the action actually hurt marriages in that it gave the plaintiff an incentive to drag the marital relationship through court resulting in what amounted to a forced sale of affections. *Fundermann,* 304 N.W.2d at 791–92.

The Washington Supreme Court also recently abolished the cause of action, reasoning that a viable marriage is not one in which an outsider can alter the mental attitude of one spouse toward the other. *Wyman,* 615 P.2d at 455. The court identified several other grounds for its decision: (1) the action does not preserve marital harmony; (2) courts cannot properly police settlements, which are often characterized by the plaintiff-spouse blackmailing the defendant into a high priced settlement with the threat of a lawsuit that could destroy the defendant's reputation; (3) the lack of standards available for assessing damages; and (4) the fact that the plaintiff is essentially selling his spouse's affections. *Wyman,* 615 P.2d at 455. The *Wyman* court affirmed the Washington Court of Appeals case which abolished the cause of action. (*See Wyman v. Wallace,* 15 Wash.App. 395, 549 P.2d 71 (1976)). Before the Court of Appeals, some additional reasons for abolition of the cause of action were noted. Those factors included the fact that the nature of the action is primarily punitive (though Washington did not allow the recovery of punitive damages for alienation of affections); the action can rearrange the marital assets which, if occurring around the time of divorce proceedings, makes it difficult to balance the needs and abilities of the former husband and wife; the action hurts the reputation of both spouses; the action diminishes the plaintiff's dignity and injures his own reputation through the process of seeking money damages; and the action can have a harmful effect on the children of the marriage. *Wyman v. Wallace,* 15 Wash.App. 395, 549 P.2d 71, 73–74 (1976). In the instant case, one of Jerry and Pauline's children, David O'Neil, was

1. Ala.Code 1975, § 6–5–331; Ariz.Rev.Stats. § 25–341; West's Ann.Cal.Civ.Code § 43.5; Colo.Rev.Stat.1973, 13–20–202; Conn.Gen.Stat. Ann. § 52–572b; 10 Del.Code § 3924; D.C.Code 1981, § 16–923; West's Fla.Stat.Ann. § 771.01; Official Ga.Code Ann. § 105–1203; West's Ann. Ind.Code 34–4–4–1; 19 Maine Rev.Stat.Ann. § 164; Md.Code, Courts & Jud.Proc., § 5–301 et seq.; Mich.Stats.Ann. § 27A.2901 [M.C.L.A. § 600.2901]; Minn.Stat.Ann. § 553.01; Mont. Rev.Code 1947, § 17–1201; Nev.Rev.Stat. 41.-380; N.J.Stat.Ann. 2A:23–1; N.Y.—McKinney's Civ.Rights Law § 80–a; Ohio Rev.Code § 2305.-29; 76 Okl.Stat.Ann. § 170; 15 Vt.Stat.Ann. § 1001; Va.Code 1950, § 8.01–220; W.Va.Code 56–3–2a; Wis.Stat.Ann. § 248.01 renumbered by L.1979, c. 32, § 51 and is now § 768.01; Wyo. Stat.1977, § 1–101.

called by Jerry to testify about his feelings towards his mother and father and toward the religious beliefs and practices of his mother and her church. At least three of the children were in the courtroom throughout the duration of the trial.

The action for alienation of affections purportedly exists to discourage third persons from weakening marriages. However, a marriage is not likely to falter without the active participation of one of its members. Never has there been any documentation that the existence of the action actually protects marriages. In fact, once suit has been brought, it notifies the public that the marriage is unstable, embarrasses the spouses and their children, and adds more tension to the family relationship. *Id.* at 251.

The primary motive in bringing the action is often for the plaintiff to vindicate himself and gain revenge on the other spouse and the defendant. *Id.* at 251. The unplanned nature of the tort, at least where sexual activities are involved, makes the threat of any damage suit unlikely to deter the culpable conduct that has allegedly interfered with the marriage. Furthermore, it is difficult for the factfinder to determine whether the defendant or the alienated spouse was primarily responsible for the alienation of affections, complicating the element of causation. *Id.* at 252. The jury is often unduly sympathetic to the plaintiff, as in one case where the plaintiff was separated from the spouse, the spouse willingly had the affair in issue, and the jury still found for the plaintiff. *Sebastian v. Kluttz*, 6 N.C.App. 201, 170 S.E.2d 104 (1969).

Moreover, since the injuries involved in alienation suits are intangible, damage awards have few standards, making it easier for verdicts to be tainted by passion and prejudice. This distinguishes alienation of affections from other causes of action involving reprehensible conduct. For example, intentional torts generally involve some physical injury to persons or property providing a basis for the assessment of damages. The intangible injuries in alien-

ation actions include loss of consortium and injuries to the plaintiff's health, reputation, and mental state (less an allowance for the lack of affection between the spouses before the alienation began). *Alienation of Affections* at 253. The suit also exposes defendants to the extortionate schemes of the plaintiff. Since the suit may well ruin the reputation of the defendant, this often creates an incentive for the plaintiff to bring the suit in hopes of forcing an expensive settlement on the defendant. This is especially true where the suit is related to divorce proceedings and the plaintiff is using the suit vengefully against the defendant and the alienated spouse. As mentioned, the suit may expose minor children of the marriage to one of the parent's extramarital activities, and it may even require the children to testify to details of the family relationship in open court. *Id.* at 254.

Since the many ill effects of the suit for alienation of affections outweigh any benefit it may have, we both affirm the ruling of the trial court and abolish the cause of action in Idaho.

## II.  INVASION OF PRIVACY

■ Invasion of privacy occurs when one intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private concerns or affairs. There is liability for such an intrusion if it would be highly offensive to a reasonable person. An intrusion may occur without physical invasion, for example, as by eavesdropping by means of wire-tapping, or by persistent and unwanted phone calling. Clearly, however, there must be something in the nature of a prying or intrusion. Also, that which is intruded into must be, and be entitled to be, private. See *Prosser and Keeton on Torts*, § 117 (5th Ed., 1984).

In 1890, Samuel D. Warren and Louis D. Brandeis reviewed a number of English and American cases purporting to have protected the right of privacy, that is, the right to be let alone. The authors concluded:

[T]he rights so protected, whatever their exact nature, are not rights arising from contract or from special trust, but are rights as against the world; and, as above stated, the principle which has been applied to protect these rights is in reality not the principle of private property, unless that word be used in an extended and unusual sense. The principle which protects personal writings and any other productions of the intellect or of the emotions is the right to privacy, and the law has no new principle to formulate when it extends this protection to the personal appearance, sayings, acts and to personal relation, domestic or otherwise.

4 Harv.L.Rev. 193, 213 (1890).

The trial court herein instructed the jury: A person's "right of privacy" encompasses various rights recognized to be inherent in our concept of ordered liberty and such rights prevent governmental (and private) interference in intimate personal relationships or activities, freedoms of individual to make fundamental choices involving himself, his family, and his relationships with others.

Jerry O'Neil contends that defendants' actions constituted an invasion of his and his wife's domestic privacy and that defendants' actions invaded the domestic privacy of his children.

The jury heard testimony that when Jerry O'Neil came to Coeur d'Alene to see his family, Pauline and the children did not see him for more than a few minutes at a time, and did not spend time with him without a chaperone. Jerry testified that church officials purposefully kept his family from seeing him, and, in fact, for a period of time later during their visit to Coeur d'Alene, hid his family from him at the residence of another church member. O'Neil testified that church officials lied to him or to Pauline or to both of them, telling him that he would have to join the church in order to marry Pauline again, but telling Pauline that all Jerry needed to do was take instruction and agree to raise the children as Catholics. Sister Mary Bernadette wrote a letter to Jerry in which she stated that Jerry must accept the religion "heart and soul" before he could marry Pauline again. Before Pauline returned to Kalispell to live with Jerry and the children, she, Jerry and Father Chicoine had a meeting outside Bishop Schuckardt's residence. Father Chicoine told Pauline then that if she found herself giving in to Jerry and acting as a wife, that it was her duty to leave him. After they returned to Kalispell, Pauline spent long hours praying with the children, and refused to talk to Jerry alone.

Aside from his own testimony about actions of church members towards his wife, Jerry O'Neil presented testimony from Barbara Strakel, director of the Cult Awareness Center in Coeur d'Alene. Strakel described for the jury the characteristics of and techniques employed by cults.[2] She testified that the practices of the Fatima Crusade have many similarities to those of a cult. The emphasis of her testimony was that the extreme and often abusive behavior of religious cults in general, and this cult in particular, can rise to the level of wrongful and malicious conduct which the courts consider actionable in an alienation of affections suit.

Although free exercise of religion enjoys a high measure of constitutional protection and allows for proselytization, there are limits. As the Washington Supreme Court noted in *Bush v. Carrieri*, 69 Wash.2d 536, 419 P.2d 132 (1966):

2. Strakel identified the following as being characteristics of and techniques employed by cults:
(1) a human leader claiming divinity;
(2) totalitarian control over a member's daily life;
(3) use of isolation for cult members as well as "loaded" language;
(4) alienation from family and friends;
(5) cultivation of deep emotional dependency;

(6) defiance of the physical needs of members;
(7) prohibition of critical analysis or independent thought;
(8) use of methods of ego destruction and mind control;
(9) deceptive recruitment and fund raising techniques; and
(10) demeaning daily work or activities.

[O]ne does not, under the guise of exercising religious beliefs, acquire a license to wrongfully interfere with the familial relationships. Good faith and reasonable conduct are the necessary touchstones to any qualified privilege that may arise from any invited and religiously direct family counseling, assistance, or advice. Ill will, intimidation, threats, or reckless recommendations of family separation directed toward alienating the spouses, where found to exist, nullify the privilege and project liability.

Several former Crusade members testified about the rigid indoctrination they underwent while involved with the church. One former Crusader stated that she joined the church after an intensive three day seminar at which participants were deprived of sleep, food and drink. Day to day activities of church members, such as television watching, reading books and contacting people outside of the Crusade were severely restricted by church rules governing such behavior. There was testimony as to the harsh physical and mental discipline of children at the church schools, and that the children eventually became withdrawn, apathetic and fearful. At least one person testified that church members spent long hours in prayer, often kneeling on the cold concrete floor of the church building. Members often fasted for hours or days.

David O'Neil, Jerry and Pauline's son, testified that after his parent's divorce, he and his siblings attended masses and other church meetings with and at the instigation of their mother, grandmother, aunt and other church members. Specifically, the children were taken to services at Mt. St. Maries in Montana during the summer three years before trial; to another church in Montana sometime before; and to Pauline's sister's home in Denver, Colorado, two summers before the trial. He also stated they had been told by members of the religious community that Jerry O'Neil's religion was wrong and that they should pray for their father's conversion. Further they were told that their father was not a true father or someone they could depend on, and that these statements changed the childrens' attitude toward their father. They said the Rosary and received religious artifacts when they visited their grandmother. David also testified that while he was in the church school in Coeur d'Alene, he was disciplined by being spanked with a stick. All the children were required to pray on their knees during the bus ride to and from school. Finally, there was testimony from Mildred O'Neil, Jerry's mother, that when the children returned from Coeur d'Alene to Kalispell, they were ragged, unkempt, quiet and depressed. David stated that they had missed their mother when she left, and that they resented being taken care of by a series of housekeepers.

There was evidence that at least one defendant, Sister Mary Bernadette Janet Urban, was aware of a Montana court order restraining Pauline O'Neil from indoctrinating her children in her religious beliefs. Sister Mary Bernadette worked closely with her mother, Alvina Urban, and with other church officials. It was not unreasonable for the jury to believe that if Sister Mary Bernadette knew about the restraining order, other church members were also likely to have known about it. It appears from the testimony that Pauline allowed her relatives and other church members to take the children to church services, and require them to participate in prayers and other church practices; in fact, Pauline, herself, apparently took the children to some of the church services they attended. Clearly, the restraining order was violated by Pauline and other persons likely to know of its existence. All of the acts of proselytization of the children by involving them in religious services occurred subsequent to the restraining order in the divorce decree. The jury was entitled to conclude from the evidence that this behavior was intentional, wrongful, and an intrusion.

This Court most recently summarized the principles which must guide the trial court in passing upon a motion for judgment n.o.v. in *Quick v. Crane*, 111 Idaho 759, 727 P.2d 1187 (1986).

A motion for judgment n.o.v. based on I.R.C.P. 50(b) is treated as simply a delayed motion for a directed verdict, and the standard for both is the same. *Yazzie v. Sullivent,* 561 F.2d 183, 188 (10th Cir.1977). In making the motion, the defendants necessarily admitted the truth of all of the plaintiffs' evidence and every legitimate inference that could be drawn therefrom in the light most favorable to the plaintiff. *Stephens v. Stearns,* 106 Idaho 249, 252–53, 678 P.2d 41, 44–45 (1984). Whether that evidence is sufficient to create an issue of fact is purely a question of law. *Gmeiner v. Yacte,* 100 Idaho 1, 4, 592 P.2d 57, 60 (1979); *Sheets v. Agro-West, Inc.,* 104 Idaho 880, 883, 664 P.2d 787, 790 (Ct. App.1983). The question is not whether there is literally no evidence supporting the party against whom the motion is made, but whether there is substantial evidence upon which the jury could properly find a verdict for that party. *Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). Hence, the trial judge is not free to weigh the evidence or pass on the credibility of witnesses and make his own separate findings of fact and compare them to the jury's findings as he would in deciding on a motion for a new trial. *Gmeiner, supra* [100 Idaho] at 4, 592 P.2d at 60. Rather, the trial judge must view all of the evidence and all inferences drawn therefrom in favor of the non-moving party, and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached. *Stephens, supra* [106 Idaho] at 253, 678 P.2d at 45; *Brand S Corp. v. King,* 102 Idaho 731, 733, 639 P.2d 429 [431] (1981). *Quick, supra,* 111 Idaho at 763, 727 P.2d at 1191.

■ In the instant cases, the trial court's "Order in re: Motion for Judgment Notwithstanding the Verdict" did not specify any deficiencies in the evidence relative to the cause of action for invasion of privacy. The jury had before it substantial competent evidence from which to conclude that the plaintiffs had established a claim and right to damages for invasion of privacy. Therefore, the trial court erred in entering judgment n.o.v. on that cause of action.

Accordingly, the verdict awarding the five children $50,000 each is reinstated, and the trial court, on remand, is directed to enter judgment thereon.

■ However, as to the $250,000 verdict awarded Jerry Bryant O'Neil, the special verdict form and record make it impossible to determine what portion thereof was awarded for alienation of affection and what portion was awarded for invasion of privacy. Therefore, the award cannot stand, and the case is remanded for new trial on the husband's cause of action for invasion of privacy.

Similarly, the $500,000 punitive damage award cannot stand because it is impossible to determine from the special verdict form what portion thereof, if any, was awarded on the basis of the cause of action for alienation of affections.

■ O'Neil's claim for attorney fees is denied on the basis of *Curtis v. Campbell,* 105 Idaho 705, 672 P.2d 1035 (1983), wherein we held that a pro se party is not entitled to attorney fees.

We note that the trial court has not yet ruled on defendants' motion for remittitur or, in the alternative, for a new trial. We do not by this opinion decide whether that motion should have been, or may yet be, considered or granted, because that issue was neither raised nor argued on appeal.

Affirmed in part, reversed in part, and remanded for further proceedings consistent herewith.

Costs to appellants. No attorney fees awarded.

SHEPARD and BISTLINE, JJ., concur.

DONALDSON, Chief Justice, dissenting.

I disagree with the majority opinion's discussion in Part II that Jerry O'Neil established that the defendant church and its members intruded upon the seclusion of the O'Neil family. I must point out, however, that even if the church had obtained information about the O'Neil's family relationships and religious beliefs without any consent on the part of Pauline, Jerry or the children, Jerry O'Neil would still have to have proved this intrusion was not only intentional, but was also malicious.

The religious freedoms protected by both the United States and Idaho Constitutions require this higher level of malice to be met when the alleged intrusion is a consequence of the exercise of the defendants' religious beliefs. The first amendment of the United States Constitution states that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." The Idaho Constitution, however, in the first clause of art. 1, § 4, states with greater specificity that, "The exercise and enjoyment of religious faith and worship shall forever be guaranteed...." The Idaho Constitution then goes further to state in the first clause of art. 21, § 19 that, "It is ordained by the state of Idaho that perfect toleration of religious sentiments shall be secured, and no inhabitant of said state shall ever be molested in person or property on account of his or her mode of religious worship." Since these constitutional protections must be read together, it is clear that the scope of an individual's privilege to practice and extoll his religious beliefs in this state is indeed very broad.

In some states, in order for a public official to be liable for intrusion into another's seclusion, the plaintiff must show the official acted in bad faith or with a corrupt motive. *Sustin v. Fee*, 69 Ohio St.2d 143, 145, 431 N.E.2d 992, 994 (Ohio 1982). It is logical, therefore, to impose a similar requirement to show bad faith in order for a plaintiff to remove a defendant's conduct from the protection of the defendant's constitutional right to freely exercise his religion. Hence, where a defendant's religious conduct is involved, in order for a plaintiff to make out a cause of action for invasion of privacy he must show the defendant's conduct was motivated by a malicious or wilful desire to intrude on the plaintiff's solitude, seclusion or private affairs, and that such conduct would be highly offensive to a reasonable person.

In evaluating whether the actions in this case rose to such a level of intentional and malicious conduct as to strip the defendants of their constitutional protections, the district court was faced with a very delicate task. It had to grapple with what were or were not "religious" beliefs and the motivations of the individuals who held and practiced them. The transcript of the trial is replete with examples where the court had to determine the relevance of evidence—both tangible and testimonial—that reflected on the merits of many of the tenets of the Fatima Crusade, particularly where they conflicted with currently held beliefs of the modern Roman Catholic Church. More often than not, evidence of questionable relevance was ruled admissible by the court or not objected to by opposing counsel.

O'Neil effectively highlighted the differences between the Fatima Crusaders and the modern Roman Catholic Church. He also revealed the existence of differences of belief among the members of the Crusade. He was unable, however, to produce any evidence that the beliefs of the members of the Fatima Crusade were not genuinely held and that the defendants' actions were instead motivated by malice towards Jerry O'Neil or his family. Pauline was called to testify by the defense and said she joined the church because she genuinely wanted to start practicing her religion again. She had been raised in the Catholic church by her parents and she testified that she believed the Crusade was the only true Catholic church. Three of Pauline's sisters and her mother were members of the Crusade at the time she joined. She also testified that her marriage to Jerry before she joined the church was not very

happy and that she was frightened of her husband.

By the time the six-day trial came to a close, it appeared that O'Neil had put on trial the logic and validity of the beliefs of the Fatima Crusade, rather than the conduct of the defendants to intentionally and maliciously intrude upon the seclusion of the O'Neil family. O'Neil and his witnesses characterized the Crusade as a "cult." In fact, Barbara Strakal of the Cult Awareness Center expressed her opinion that the Crusade was a "destructive cult." Indeed, to the average person the evidence did seem to indicate the practices of the Crusade were unusual and perhaps even archaic. Their beliefs were similar to the modern Roman Catholic Church but with notable exceptions, not the least of which were their methods of dress and of prayer and their refusal to recognize the Popes in Rome after Vatican II as legitimate.

O'Neil apparently convinced the jury that the Crusade crossed the line between being a legitimate religious organization and a "cult." That, however, is *irrelevant* to the issues of intent and malice in this cause of action. By characterizing a religious organization as a cult, one cannot thereby divest it of its constitutional rights. There is no requirement that a religion meet any organizational or doctrinal test in order to qualify for constitutional protection. *Sequoyah v. Tennessee Valley Authority,* 620 F.2d 1159, 1163 (6th Cir.1980).

The United States Supreme Court in *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), said

"In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Id.* 310 U.S. at 310, 60 S.Ct. at 906.

In *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), the Supreme Court grappled with the term "religious" belief or practice and noted that any court determination of what that is should not "turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent or comprehensible to others in order to merit First Amendment protection." *Id.* 450 U.S. at 714, 101 S.Ct. at 1430. The Court then went on to hold that,

"Courts should not undertake to dissect religious beliefs because the believer admits that he is 'struggling' with his position or because his beliefs are not articulated with the clarity and precision that a more sophisticated person might employ.... Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses. One can, of course, imagine an asserted claim so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause; ... and the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.... Courts are not arbiters of scriptural interpretation." *Id.* at 715–16, 101 S.Ct. at 1430–31.

The evidence of the defendants' practices which O'Neil presented was not so bizarre and so clearly nonreligious in motivation that it should not be afforded constitutional protection. The district court reached the same conclusion as the Ohio Court of Appeals when it was faced with an almost identical fact situation involving the same defendants. There, the court overturned a jury verdict against the defendants and stated that

"the alleged misconduct by the defendants is the dissemination of the belief that a person should follow the Bishop Schuckardt approach to the Catholic faith and, if necessary, a person should leave a spouse who interferes with such practice of religion. This kind of advocacy of a religious faith and tenets incident thereto is not illegal." *Radecki, supra* [50 Ohio App.2d] at [62], 361 N.E.2d at 544. See also *Bradesku v. Antion,* 21 Ohio App.[2d] 67, 255 N.E.2d 265.

"In the absence of improper motives, a religious sect has a lawful right to solicit members and to express views relevant thereto if there is nothing unlawful, improper, or immoral in such activity." *Radecki, supra* at [62], 361 N.E.2d at 545. *See also Hughes v. Holman,* 110 Ore. 415, 223 P. 730 (1924).

It should also be emphasized that parents have considerable freedom to raise their children in their religious faith. As the United States Supreme Court noted in *Wisconsin v. Yoder,* 406 U.S. 205, 213–14, 92 S.Ct. 1526, 1532–33, 32 L.Ed.2d 15 (1972), "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society" and must be "zealously protected." In this case, Pauline wanted to raise her children in her faith just as her mother before her did. Any and all contacts that the O'Neil children had with the teachings and practices of the Fatima Crusade were directly due to their mother's involvement in the church.

Again, what appears to have motivated the jury to find against the defendants with respect to the alleged invasion of the children's privacy was the same evidence that depicted the Fatima Crusade as a "cult:" the children were dressed more conservatively; they said their prayers at length while kneeling on hard floors or in the bus on the way to school; they were taught that the Crusade was the only true church; and they were disciplined by spanking and rapping the knuckles with a stick. Defense witnesses testified that the atmosphere that the children were exposed to was no different than many Catholic schools before Vatican II. O'Neil had no evidence to rebut this, but preferred to contrast the Crusade's methods with the arguably more "enlightened" practices of the modern Roman Catholic Church.

The district court found that when the evidence is scrutinized in the context of the defendants' legitimate constitutional rights, reasonable minds could not reach the same conclusion as the jury did. In light of the direction given to us by the United States Supreme Court and our own state constitution, and in light of the evidence presented to the jury, it is clear that there was insufficient evidence for the jury to conclude that the defendants' conduct was motivated by an intentional and malicious desire to intrude upon the seclusion of the O'Neil family.

"[R]eligious freedom—the freedom to believe and to practice strange and, it may be, foreign creeds—has classically been one of the highest values of our society." *Yoder, supra* 406 U.S. at 238, 92 S.Ct. at 1544 (White, J., concurring). The rights of the defendants to freely exercise their religious beliefs play a critical role in the evaluation of the evidence of this case. The district court clearly recognized this when it reviewed the jury's verdict on defendants' motion for judgment n.o.v. I would affirm the district court.

BAKES, J., concurs.

BAKES, Justice, dissenting as to Part II:

The majority opinion states that an "[i]nvasion of privacy occurs when one intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private concerns or affairs." *Ante* at 698. However, with the possible exception of the defendant Sister Mary Bernadette, the Court's opinion points to no evidence that defendants Schuckardt, Chicoine, The Fatima Crusade, or Christ the King Priory, Inc., "intentionally intrude[d], physically or otherwise, upon the solitude or seclusion of [the plaintiffs]...."

The trial court granted its judgment notwithstanding the verdict because such evidence was totally lacking. The Court's opinion today does not identify any evidence of intentional intrusion, but rather assumes that, "if Sister Mary Bernadette knew about the restraining order, other church members were also likely to have known about it." *Ante* at 700. The Court then finds that, "Clearly, the restraining order was violated by Pauline and other persons likely to know of its existence." However, Pauline, Jerry's wife, was not a party defendant to the action. The Court then concludes by stating, "The jury was entitled to conclude from the evidence that this behavior was intentional, wrongful, and an intrusion."

The only evidence which the Court's opinion points out which could even possibly sustain the jury verdict was with regard to the defendant Sister Mary Bernadette. There was no evidence that the other defendants intentionally intruded. It is not enough merely to state that other "church members were also likely to have known about it." That is an assumption for which there is no evidence in the record.

Accordingly, the trial court was correct in concluding that there was no substantial evidence that the defendants Schuckardt, Fatima Crusade, Chicoine, and Christ the King Priory, Inc., ever intentionally intruded upon the solitude or seclusion of the plaintiffs. As to those defendants at least, the trial court's judgment notwithstanding the verdict on the invasion of privacy claim should be affirmed.